[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 14, 2003
THOMAS K. KAHN
CLERK**

_____

No. 02-10861

_____

D. C. Docket No. 00-04912 CV-JLK

ALMA KNIGHT,

                                        Plaintiff-Appellant,

        versus

BAPTIST HOSPITAL OF MIAMI, INC.,
a Florida corporation,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 14, 2003)**

Before EDMONDSON, Chief Judge, ANDERSON, Circuit Judge, and POGUE*,
Judge.

_____

    *Honorable Donald C. Pogue, Judge, United States Court of International Trade, sitting by
designation.

PER CURIAM:

In this Title VII racial discrimination case, Alma Knight appeals the district court's grant of summary judgment to her former employer, Baptist Hospital of Miami, Inc. (Baptist). The district court concluded that Knight failed to establish a prima facie case. We affirm.

BACKGROUND

In May 1996, Knight, an African-American female, was hired by Baptist to work as a clinical nurse in the surgical services department. She worked as a Charge Nurse and had various responsibilities. Knight was supervised by Isabel Hotchkiss (Nurse Manager) and Jessy Theisen (Assistant Nurse Manager). Hotchkiss and Theisen were supervised by Michele Ryder the Assistant Director of Surgical Services. Knight claims that Ryder often treated her with intolerance, unfairness, and a lack of objectivity. Knight was employed by Baptist until her termination on 23 May 2000.

Baptist utilizes a 4-step disciplinary process: (1) "informal discussion and agreement," (2) "discussion and formal written agreement," (3) "decision-making leave," and (4) termination. Decision-making leave is a paid day of suspension for

2

the employee to decide whether they want to continue working for Baptist. During decision-making leave, the employee is required to draft and to submit an "action plan" that proposes a solution to the noted deficiencies. If no "action plan" is submitted, the employee must either resign or face termination.

Knight was given decision-making leave on 9 May 2000. Knight's decision-making leave arose out of an incident where Knight was rude and disrespectful to two other employees: Patrice Hines and Doctor Wendy Whittick. Hines complained to her supervisor, Robert Zayas, about Knight's conduct and then filed a complaint with Ryder about the incident.

Ryder investigated the complaint. She then met with Hotchkiss and Theisen, and they decided to place Knight on decision-making leave based on the incident and Knight's "well documented disciplinary history." This four-year history included several performance issues: (1) failing to check refrigerator temperatures; (2) failing to comply with latex-allergy procedures; (3) scheduling standby cases without permission; (4) failing to send for patients in a timely manner; (5) unnecessarily calling in staff; (6) on other occasions, acting rudely and disrespectfully toward coworkers; and (7) having substantial problems of absenteeism and tardiness. Knight earlier received formal counseling, the second

3

step in the disciplinary process, for her tardiness and for unnecessarily calling in staff.

Along with the decision-making leave, Knight was asked to submit an action plan covering two problems: her tardiness and her unprofessional and disrespectful behavior. Following her decision-making leave, on 11 May 2000, Knight turned in an action plan. Knight's action plan adequately addressed her tardiness issues but did not mention her behavior problems. Knight was asked to turn in a second action plan addressing this issue by 12 May. Knight missed this deadline.

Knight submitted her second action plan on 22 May. Ryder rejected this plan as inadequate, because the "action plan" was argumentative and proposed no solution. The plan merely restated Knight's version of the incident with Hines and said that it was "petty." On 23 May 2000, Knight's employment was terminated.

Knight filed a grievance through Baptist's grievance program. Her termination was upheld. Knight then filed this lawsuit in the Southern District of Florida. She alleged that she was the victim of disparate treatment and retaliation in violation of Title VII of the Civil Right's Act of 1964, 42 U.S.C. § 2000(e) et seq., 42 U.S.C. § 1981, and the Florida Civil Rights Act of 1992, Florida Statutes, § 760.10 (2000).[1] Baptist moved for summary judgment, arguing that Knight could

---

[1] The retaliation claims are no issue in this appeal.

4

not establish a prima facie case of discrimination because she could not identify a similarly situated person from a different class who was treated more favorably. In response, Knight pointed to Jean Arnold.

Arnold was a Caucasian nurse at Baptist. Knight claims that Arnold had significant tardiness and behavioral problems but was not severely disciplined. Arnold's 1997 performance evaluation noted that "[o]n occasion, severe, unproductive, and inappropriate exchanges occur with coworkers." She was not placed on decision-making leave, and her employment was not terminated.

The district court concluded that Arnold and Knight were not similarly situated and granted Baptist's motion for summary judgment.

## DISCUSSION

Summary judgment is only appropriate where there "is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We review a district court's grant of summary judgment de novo. Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996). We view all the evidence, and make all reasonable factual inferences, in the

5

light most favorable to the nonmoving party. Maniccia v. Brown, 171 F.3d 1364, 1367 (11th Cir. 1999).

The district court granted Baptist's motion for summary judgment because it determined that Knight failed to establish a prima facie case.[2] Where direct evidence of discrimination is absent, a plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: "(1) [she] belongs to a racial minority; (2) [she] was subjected to adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [she] was qualified to do the job." Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997)(citing McDonnell Douglas Corp. v. Green, 93 S.Ct. 1817, 1824-25 (1973)).

For the purpose of the motion for summary judgment, Baptist concedes that (1) Knight was a member of a racial minority; (2) she was subject to adverse employment actions -- including being placed on a decision-making day and being fired -- and (3) she was qualified for her job. Baptist argues, and the district court

---

[2] The district court also granted summary judgment because, even if Knight could establish a prima facie case, Knight could not show that Baptist's non-discriminatory reasons for their actions were pretextual. Because we agree that Knight has not shown a prima facie case, we affirm the grant of summary judgment without discussing this issue.

concluded, that Knight cannot establish a prima facie case because she cannot show that similarly situated employees of other races were treated better.

To show that employees are similarly situated, the plaintiff must show that the "employees are similarly situated in all relevant respects . . . . In determining whether employees are similarly situated . . . it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Id. at 1562.

Knight argues that Jean Arnold was a similarly situated Caucasian nurse who was treated more favorably.[3] Knight was placed on decision-making leave after a review of her entire record. Knight claims that Arnold "committed similar, if not more egregious, acts of misconduct." Despite Arnold's acts of misconduct, Knight points out that Arnold was not placed on decision-making leave.[4]

_____

[3] Knight also argues that the district court erred by requiring her to point to an identically situated employee as opposed to a similarly situated employee. Knight claims that had the district court used the proper standard it would have found Knight and Arnold to be similarly situated. While the district court did say that Arnold's record was not "nearly identical" to Knight's, we do not believe that the district court thought "identical" was the key or that the district court applied the wrong standard.

[4] Knight alleges that she was subject to two adverse actions: she was placed on decision-making leave, and her employment was terminated. We focus our inquiry on whether Knight and Arnold were similarly situated in relation to the decision-making leave, that is, whether Arnold's conduct was substantially similar to the conduct that resulted in Knight's decision-making leave. It is uncontested that Knight's termination was based on her failure to submit an acceptable action plan at the end of her decision-making day. Knight points to no employees who were not terminated after they failed to submit an acceptable action plan. Knight can establish a prima facie case based on her termination, however, if the decision to give her a decision-making day was discriminatory: the termination, which

7

A review of Knight's and Arnold's cumulative records reveals that the two were not similarly situated. While their histories of problems with coworkers are similar, Arnold's record is substantially better then Knight's when it comes to job performance and tardiness.

Both Arnold and Knight have documented histories of problems with coworkers. Knight's history includes the incident involving Ms. Hines and Dr. Whittick (which led to the decision-making leave) and two prior documented instances of rude and disrespectful conduct. Arnold's record includes two instances where surgeons complained about her disrespectful attitude.[5] While Arnold was reprimanded after the instances, she was not placed on decision-making leave. Had

---

arose out of the decision-making day, would be improper as well.

[5] Knight argues that Arnold's history includes two additional incidents of rude and disrespectful behavior that make Arnold's record worse then hers. First, Knight complained that Arnold was rude to her. The evidence, however, indicates that both Arnold and Knight made several complaints against each other and that Ryder did not believe these complaints accurately reflected an actual problem. Neither Knight nor Arnold was disciplined based on the complaints, and Arnold's complaints against Knight were not considered in the decision to give Knight decision-making leave. Second, Knight says (and Arnold admitted in her deposition) that Arnold was kicked out of Dr. Puente's operating room on three or four occasions. But, no evidence exists that Dr. Puente ever complained about these events to management. While Arnold's "feud" with Dr. Puente might have justified giving her a decision-making day, unless Ryder, Hotchkiss, or Theisen (Arnold and Knight's supervisors) knew of the events, the events cannot be considered in determining whether Knight and Arnold are similarly situated. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1186 (11th Cir. 1984)("[I]f an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown."(quoting Chescheir v. Liberty Mut. Ins. Co., 713 F.2d 1142, 1148 (5th Cir. 1983)). "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1262 (11th Cir. 2001).

8

Knight's decision-making leave been based solely on her behavioral problems, Arnold might have been similarly situated. But Knight's decision-making leave was based on a review of her entire record, including her performance and tardiness issues.

Knight's history of performance problems is substantially worse than Arnold's. Knight's four-year history includes documented instances of these things: (1) failure to check refrigerator temperatures, (2) failure to comply with latex-allergy procedures, (3) scheduling standby cases without permission, (4) failure to send for patients in a timely manner, and (5) unnecessarily calling in staff.[6] Arnold's seven-year history includes only one documented performance issue: her failure to document a problem with the blood refrigerator on 5 June 2000. Arnold was given an Agreement for Performance Improvement based on this event and required to write an action plan on the bottom of the Performance Improvement form. Arnold's performance history is substantially better than Knight's.

---

[6] Knight disputes that some of these events occurred. What is important is that these events were documented in her record. Even if, as Knight claims, the events did not actually occur, they can be considered if Ryder (the decision-maker) honestly believed they occurred. See Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1989) ("The law is clear that, even if a Title VII claimant did not in fact commit the violation . . . an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.").

Knight and Arnold's problems with absenteeism and tardiness are very different. While both had problems in this area, their problems were not of the same nature. Arnold's record indicates someone who had problems, but was improving. Her record also indicates that she took on extra responsibilities to compensate for some of her problems. Knight's problems progressively worsened, and despite counseling, she made little, if any, effort to compensate for her problems. The differences between Knight and Arnold are apparent from the performance evaluations.

In December 1995, Arnold received a 1.74[7] in the Dependability/Reliability category (where absenteeism and tardiness are reflected), and the evaluation indicates that Arnold "agreed to come in on days off to help cover the department as needed." In January 1997, Arnold received a 3.13. In January 1999, she received a 3.2, and the evaluation asked Arnold to work on reducing her absences and reflected that she had 2 excused absences and 2 late days during the year.[8] In January 2000, she received a 3.04, and the evaluation noted that, although she was late 12 times, she worked extra on more than 26 occasions. Arnold's absenteeism

---

[7] The evaluations were graded on a four point scale, with 4.00 being "Exceeds Expectations;" 3.00 being "Fully Meets Expectations; 2.00 being "Minimally Meets Expectations;" 1.00 being "Does Not Achieve Expectations."

[8] The record does not contain a January 1998 evaluation for Ms. Arnold.

10

and tardiness problems resurfaced in early 2000, and she was counseled because she had been late 9 times and absent 4 times during a seven-month period. These problems were also reflected in her 5 June 2000 Agreement for Performance Improvement. While Arnold did have problems with absenteeism and tardiness, the record does not indicate that her problems were nearly as severe as Knight's.[9]

Knight's record is substantially less good. In her 1997 evaluation, Knight received a 2.92 in Dependability/Reliability. In 1998 this had fallen to 2.13. In October 1998, Knight was counseled on her tardiness and told that she "needs to come to work on time and have no more occurrences."[10] Despite this warning, Knight accumulated 16 occurrences (7 excused absences and 9 tardies) between her 1998 and 1999 evaluations and received a 1.73 on the 1999 evaluations. Knight's downward trend continued; between her 1999 and 2000 evaluations she accumulated 14 occurrences and she received a 1.38 on the 2000 evaluation. Nothing in the record indicates that Knight compensated for her absence or tardiness by working extra hours at the hospital.

In the light of the entire record, Knight and Arnold are not similarly situated. Knight's documented performance and tardiness problems were much worse than

---

[9] The record does not indicate how Arnold performed after receiving written counseling.

[10] The term "occurrences" encompasses both excused absences and tardies.

11

Arnold's in both number and nature.  Knight's problems did not improve after she was counseled and warned in writing about them.  Because Arnold and Knight are not similarly situated, that Arnold was not also placed on decision-making leave creates no inference of discrimination against Knight.  Knight has failed to establish a prima facie case of discrimination.  The district court's grant of summary judgment is AFFIRMED.

AFFIRMED.

POGUE, Judge, dissenting:

In my view, the majority opinion's discussion addressing the comparability of Knight and Arnold's job performance does not draw reasonable inferences in favor of the plaintiff. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-1 (2000). Drawing reasonable inferences in plaintiff's favor, on the record here, a reasonable jury could conclude that Ms. Knight and Ms. Arnold are similarly situated.

With regard to their documented histories of problems with coworkers, the majority appears to agree that Ms. Knight and Ms. Arnold are similarly situated. The majority claims that the differences in their performance histories and records of absenteeism and tardiness would preclude a reasonable fact-finder from finding them comparable on the basis of their cumulative employment record as a whole.

With regard to their performance histories, however, because Arnold was given an Agreement for Performance Improvement for the blood refrigerator incident (a written disciplinary action), a reasonable jury could conclude that the employer considered that infraction to be more serious than the incidents documented in Knight's record (mere oral reprimands).

With regard to absenteeism and tardiness, the record indicates that both Knight and Arnold were given an Agreement for Performance Improvement, a formal (written) disciplinary action because of their absenteeism or tardiness. Accordingly, drawing

13

reasonable inferences in favor of the plaintiff, Knight and Arnold appear similarly situated in this regard.

Accordingly, with regard to Knight's and Arnold's respective employment records taken as a whole, the employer's own progressive disciplinary system provides a basis to infer that Knight and Arnold are similarly situated. The fact that Arnold had twice previously been given an Agreement for Performance Improvement, two formal (written) disciplinary actions whereas the incident that led to Knight's termination was only her second formal (written) discipline provides a reasonable basis for a jury to conclude that Arnold's historical record was at least as negative as Knight's. Consequently, a reasonable jury could conclude that the defendant's action with regard to Knight's problem with her coworkers (requiring an Agreement for Performance Improvement and imposing a suspension or decision-making day) was not even-handed when compared to its response to Arnold's similar problems. Moreover, Knight's 2000 evaluation, issued contemporaneously with the disciplinary action at issue here, rated her performance overall as 3.39, more than "fully meets expectations." Therefore, a reasonable jury could find the employer's explanation for its actions lacks credibility.