**William BROWN, Plaintiff,**

v.

**SYBASE, INC., Defendant.**

**No. 02–21265–CIV.**

United States District Court, S.D. Florida.

Sept. 23, 2003.

Stuart A. Rosenfeldt, Scott Walter Rothstein, Melissa Britt Lewis, Rothstein, Rosenfeldt, Dolin & Pancier, Fort Lauderdale, FL, for William Brown.

Patrick Gerald DeBlasio, III, Susan Hilary Stern, Jackson Lewis, LLP, Miami, FL, for Sybase, Inc., a Delaware corporation.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARRA, District Judge.

This Cause comes before the Court on the Defendant's Motion for Summary Judgment, filed May 1, 2003 (DE 47). The Plaintiff filed a response (DE 53) on May 30, 2003. The Defendant filed a reply (DE 58) on June 20, 2003. The matter is now ripe for review.

### I. Facts

The facts, as culled from affidavits, depositions, answers to interrogatories and reasonably inferred therefrom in a light most favorable to the Plaintiff, for purposes of this Motion, are as follows:

*Brown's Position at Sybase and His Prior Work Experience*

In September of 2000, William Brown, an African–American, was hired by New Era of Networks ("NEON"), Defendant Sybase Inc.'s predecessor-corporation ("Sybase"). NEON/Sybase sells computer software. Brown was hired to work as one of NEON/Sybase's Regional Sales Managers. As a Regional Sales Manager, Brown's responsibilities included promoting and selling NEON/Sybase's software products and developing prospects.

Prior to working for NEON/Sybase, Brown worked in technical and sales positions at Candle Inc. ("Candle"), a company which sold products similar to those offered by NEON/Sybase. In his sales position at Candle, Brown made sales totaling approximately $300,000 of his $1 million quota in 1997; $100,000 or $200,000 of his $1.1 million quota in 1998; and $7 million

of his $1.3 million quota in 1999. His sales figure in 1999 was the result of the combined efforts of several salespersons on one account.

Brown's success at Candle and his understanding of the software business prompted Tom Baehr, NEON's Vice President of Eastern Region Sales Director, to recommend Brown for the position of Regional Sales Manager at NEON. Upon Baehr's recommendation, the hiring manager, Alan Cowart, hired Brown for the position.

At the beginning of his employment, Brown was supervised by Alan Cowart. However, in December 2000 or early January 2001, Gibson Amstutz replaced Cowart and took over as Plaintiff's supervisor until Brown's termination. Three other regional sales managers, all of whom are white males, also reported to Amstutz: Glenn Hoffer, Tim Kinney, and Emmit Avery.

*Brown's Performance at Sybase*

In his position at Regional Sales Manager, Brown had a $1.3 million annual sales quota, including a step quota of $300,000 to reach by the second quarter of 2001. During his entire employment at Sybase, however, Brown did not close any sales. Moreover, at any one time, Brown had only four to six prospective opportunities in his "pipeline," and had only two forecasts, i.e. opportunities that he expected to close, but did not. (Affidavit of Amstutz ¶ 8; Exhibit E, Brown's Performance Improvement Plan.)

According to Pat Pape, who was the Director of Human Resources at the time, Brown "was the only sales manager [in Amstutz's team] who failed to make any sales *and* failed to keep any potential opportunities in his pipeline or forecast for any significant period of time." (Affidavit of Pape ¶ 10.) (emphasis added). There is no evidence of the dollar amounts of Brown's pipeline prospects and forecasts.

*The Performance of Brown's Counterparts*

Like Brown, none of the other members of Amstutz's team made their sales quotas in 2001. However, two of the salespersons did make sales in 2001: Hoffer made $100,000 in sales, and Kinney made $500,000 in sales. (Exhibit H to Defendant's Motion for Summary Judgment.) Avery did not make any sales in 2001. (Exhibit H to Defendant's Motion for Summary Judgment.) As for pipeline attainment, Hoffer had approximately $6 million in prospects and $3 million in pipeline forecasts; Kinney had $6 million in prospects and $1 million in pipeline forecasts; and Avery had approximately $1 million in prospects and $3 million in pipeline forecasts. (Exhibit H to Defendant's Motion for Summary Judgment.)

Brown attributes his low number of sales and the poor performance of all the salespeople at NEON to customer reaction to NEON's impending merger. (Deposition of Brown at 270.) Brown speculates that prospective customers were leery of buying products from NEON because they were afraid that it would not be in existence in the future. (Deposition of Brown at 270.) Brown does not attribute his poor performance to Amstutz's management. (Deposition of Brown at 270.)

*Amstutz's Management and Racial Comment*

As supervisor, Amstutz conducted regular meetings, provided each member of his team with a book containing sales techniques, offered to them a few of his own sales techniques and "war stories," and provided them with sales leads. (Deposition of Brown at 222.) In addition, Amstutz distributed sales leads to each of the four regional sales managers.

Brown characterized Amstutz's distribution of sales leads as one in which Amstutz gave the leads to "who[m]ever he liked the best that day." (Deposition of Brown at

188–90.) Amstutz gave Brown approximately two or three sales leads, including Baptist Hospital. Amstutz gave Avery one lead and gave Kinney at least three leads. None of these leads developed into sales. (Deposition of Brown at 188–90.) Amstutz also gave Hoffer many bank leads in the financial industry; notably, however, there is no record evidence as to the outcome of the leads given to Hoffer.

On several occasions, Brown asked Amstutz for individual assistance. In response, Amstutz would offer incomplete assistance and sometimes would not return telephone calls, and Amstutz always responded to Brown last. (Deposition of Brown at 221–22.) In one instance, in February 2001, Brown asked Amstutz for a script to use in his "cold sales calls." Amstutz did not provide Brown with the requested script until approximately four months later on June 13, 2001. (Deposition of Brown at 251.) In another instance, where Brown was attempting to close a $25,000 pending deal with Baptist Hospital, Amstutz did not respond to Brown's request for advice in a timely fashion. (Deposition of Brown at 248.)

On or about March 13, 2001, Brown witnessed Amstutz say that a consulting company was as "slick as a nigger in a wood pile." (Deposition of Brown at 222.) Amstutz made the comment during a meeting with Brown and an engineer at Sybase in regard to a discussion about a potential account with Corning Cable ("Corning"). (Deposition of Brown at 222.) Amstutz made the comment in reference to the fact that the consulting company, Anderson Consulting, had become involved in the evaluation of Brown's proposal to Corning and had prevented the deal from closing. (Brown Deposition at 222; Amstutz Affidavit at ¶ 17.)

On that same day, Brown called NEON's Human Resources Department, and reported the comment to Pat Pape, then NEON's Director of Human Resources NEON's. Pape investigated Brown's complaint. By written memorandum dated March 20, 2001, Tom Baehr, NEON's Vice President of Eastern Region Sales, reprimanded Amstutz for making the statement and threatened "immediate dismissal" if Amstutz repeated the conduct. (Exhibit I, Letter from Baehr to Amstutz, dated March 20, 2001.)

*Sybase Merger*

In April 2001, Sybase merged with NEON. After the merger, there was a "large" increase in the percentage of sales persons who were placed on a Performance Improvement Plan ("PIP"). (Baehr Affidavit at 48.)

*Incidents at Sales Meetings*

In or around March or April of 2001, Baehr had a sales meeting with Amstutz's entire sales team, as well as individual meetings with the sales representatives about their sales pipeline. During the individual meeting with Brown, Brown admitted to Baehr that he did not understand the products or how to sell them. (Deposition of Baehr at 8–9.) That day, Baehr spent several hours explaining the products and the marketplace with Brown. (Deposition of Baehr at 8–9.) After that meeting, Baehr communicated to Amstutz that Brown needed more assistance than the other salespeople, in terms of understanding the products and being prepared to sell them. (Deposition of Baehr at 9–10.)

Additionally, during an April sales meeting, John Valencia, Senior Vice President of Sales, singled out Brown and told Brown that he was the only one who had not made any sales and yet had been with the company for seven months. (Deposition of Brown at 240–41.) At that time, Kinney and Hoffer had previously made sales for the company, although none for that quarter, and both had pipelines to

report. At that time, Avery had not made any sales for the company but he had not been with the company as long. (Deposition of Brown at 240–41.)

*Brown's Placement on a PIP*

On June 5, 2001, Brown was placed on a Performance Improvement Plan ("PIP"). There is conflicting evidence as to who made the decision to place Brown on a PIP. (*See* Plaintiff's Response at 4.) The reason Brown was placed on the PIP was because his "performance [wa]s below that expected of a Regional Sales Manager, particularly with regard to pipeline attainment." (Exhibit E, Performance Improvement Plan for Brown.) In the PIP, Brown was notified that his failure to demonstrate the required improvements during the term of the PIP would result in the termination of his employment. (Exhibit E, Performance Improvement Plan for Brown.)

Brown's colleagues in Amstutz's team, Hoffer, Kinney, and Avery, were all placed on PIPs at later times, the exact dates of which are not reasonably inferred from the record.

Brown was placed on a PIP having a thirty-day term. (Exhibit E, Performance Improvement Plan for Brown.) It was Sybase's practice to place poor performers on either thirty-day or sixty-day PIPs. (Exhibit A, Disciplinary Action Policy in Human Resources Policies and Procedures 3.0.) There is no evidence from which the Court can reasonably infer which employees at Sybase were placed on sixty-day PIPs and which were placed on thirty-day PIPs; the PIPs in the record have been redacted for confidentiality purposes. There is evidence at least that the other six individuals who were placed on thirty-day PIPs were all white. (Affidavit of Pape ¶ 6, attached to Reply.)

*Notice of the Territory Change*

Beginning June 8, 2001, Amstutz changed the sales territory for all the salespersons on his team, including Brown. On June 8, 2001, Amstutz gave notice of the territory change via email to all of the salespersons except Brown. Amstutz did not send the email to Plaintiff William Brown, but instead to a "Kevin" Brown. On June 11, 2003, Brown informally learned of the territory change from Avery. Brown believes that Amstutz misdirected the email on purpose. Brown points to the fact that Amstutz had never previously misdirected an email intended for Brown and because Amstutz had a meeting with all of his sales representatives, including Brown, on the same day he sent the email but did not discuss the territory change. (Deposition of Brown at 196–97.) Amstutz has stated that his misdirection of the email was an honest mistake. (Amstutz Affidavit ¶ 22.)

Although the territory change could have affected Brown's ability to meet his PIP requirements, *see* Deposition of Baehr at 78, Amstutz permitted Brown to keep any accounts in the previous territory in which Brown might have had a potential sale. (Deposition of Brown at 252.)

*The PIP Period*

During the PIP period, Amstutz regularly reviewed Brown's call activity and commented on his activity weekly. (Deposition of Brown at 247; Exhibit F, series of eight emails from Amstutz to Brown in June 2001 offering assistance.) Pape, Amstutz, and Brown had regular private telephone conference calls on Monday mornings which usually lasted fifteen minutes. (Deposition of Brown at 247–48.) Amstutz also asked Brown "all the time" during the PIP period whether Brown needed help. (Deposition of Brown at 248.) However, Brown viewed Amstutz's offers as disingenuous based upon the several times pre-PIP that Amstutz failed to give Brown timely advice. (Deposition of Brown at 248.)

During the PIP period, Amstutz instructed Brown to make twenty-five sales calls per day. (Deposition of Brown at 250.) The practice at Sybase was to require sales representatives on PIPs to make ten calls per day. However, there is no evidence as to the number of telephone calls that Brown's colleagues on Amstutz's team were required to make during the terms of time period of their PIPs.

Brown's PIP required him to achieve 100% of his revenue quota for the second quarter of 2001. (Exhibit E, Performance Improvement Plan for Brown.) In terms of pipeline attainment, the PIP required Brown to identify, qualify and enter into the sales opportunity forecasting system 300% of the remaining 2001 $1.3 million quota.(Exhibit E, Performance Improvement Plan for Brown.) Brown did not meet the requirements of the PIP.

There is no evidence from which the Court can reasonably infer the terms of the PIPs of the other sales representatives on Amstutz's team.

*Brown's Termination*

On July 9, 2001, Brown was terminated for the stated reason that he failed to meet the terms of his PIP and for his lack of sales. (Affidavit of Pape ¶ 14; Deposition of Baehr at 82.) Tom Baehr and John Valencia made the decision to terminate Brown's employment. (Affidavit of Pape ¶ 14.) Tom Baehr advised Plaintiff that his employment was being terminated.

In the third quarter of 2001, all three of the remaining sales managers in Amstutz's group, Hoffer, Kinney, and Avery, were placed on PIPs and terminated for poor sales performance. (Pape Affidavit attached to Reply Memorandum ¶ 6.)

## II. Summary Judgment Standard

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party bears the burden of proof on an issue, the moving party need not come forward with affidavits or other material negating the opponent's claim. *Id.* Instead, the moving party may discharge its burden by "showing" or "pointing out" to the Court by a review of the record that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548.

When a moving party has discharged its burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the party opposing the motion.

*Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir.1998) (citations and quotations omitted). The Court must "avoid weighing conflicting evidence or making credibility determinations." *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir.1999). Rather, the determination is whether there are any genuine issues of fact which should properly be resolved by the fact finder because they can be resolved in favor of either party. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

### III. Legal Discussion

#### A. Title VII Race Discrimination Claim

##### 1. McDonnell Douglas Framework

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Where direct evidence of discrimination is unavailable, a Title VII plaintiff may establish a prima facie case of discrimination through circumstantial evidence under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir.1997).

■■■■ Under the *McDonnell Douglas* framework, a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) the plaintiff belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees of other races more favorably; and (4) he was qualified to do the job. *Holifield*, 115 F.3d at 1562; *see also McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. "Demonstrating a prima facie case is not onerous; it requires only that the

plaintiff establish facts adequate to permit an inference of discrimination." *Holifield*, 115 F.3d at 1562 (citations omitted).

■■■■ With respect to the second element of the prima facie case of discrimination, it is clear that not all conduct by an employer negatively affecting an employee constitutes adverse employment action. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir.2001). To establish sufficiently adverse employment action, a plaintiff must show a "serious and material" change in the terms, conditions or privileges of employment. *Id.* at 1239. Although the statute does not require any direct economic consequences, the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a "real and demonstrable way," and the asserted impact cannot be speculative and must at least have a "tangible adverse effect" on the plaintiff's employment. *Id.* "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* at 1238. The limitation is consistent with the basic principle that "Title VII[ ] is neither a general civility code nor a statute making actionable the 'ordinary tribulations of the workplace.' " *Id.* (quoting *Gupta v. Florida Bd. Of Regents*, 212 F.3d 571, 587 (11th Cir.2000)).

■■■■ With respect to the third element of a prima facie case, the plaintiff must show that " 'the employees are similarly situated in all relevant aspects ... In determining whether employees are similarly situated ... it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.' " *Knight v. Baptist Hosp., Inc.*, 330 F.3d 1313, 1316 (11th Cir.2003) (per curiam) (quoting *Holifield*, 115 F.3d at 1562); *see also Osram Sylvania, Inc. v. Teamsters*

*Local Union 528,* 87 F.3d 1261, 1265 (11th Cir.1996) ("Disparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts."); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1186 (11th Cir.1984) ("If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.") (citations and internal quotations omitted).

 As to the fourth element, in certain termination cases, the question of whether the plaintiff was qualified to do the job is often not at issue. *Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir.2001). In cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred. *Id.* Thus, " 'allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered ... when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.' " *Id.* (quoting *Damon v. Fleming Supermarkets, Inc.,* 196 F.3d 1354, 1360 (11th Cir.1999)).

If a prima facie case has been shown, then the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The defendant's burden is one of production; it need not persuade the court that it was actually motivated by the proffered reasons. *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir.2000) (internal citations and quotations omitted). This intermediate burden is "exceedingly light." *Holifield,* 115 F.3d at 1564 (internal citations and quotations omitted).

If the defendant satisfies the burden of production, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action. *Chapman,* 229 F.3d at 1024; *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

 In other words, the plaintiff may attempt to demonstrate that the proffered reason was merely a pretext for the defendant's acts. *Silvera v. Orange County School Bd.,* 244 F.3d 1253, 1258 (11th Cir.2001); *see also Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Pretext means more than inconsistency; pretext is "a lie, specifically a phony reason for some action." *Silvera,* 244 F.3d at 1261. The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perception of his performance. *Holifield,* 115 F.3d at 1565. Where the employer produces performance reviews or other documentary evidence showing poor performance, an employee's assertions of his own good performance are not sufficient to defeat summary judgment. *Id.*

"If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman,* 229 F.3d at 1024–25.

### 2. Application of McDonnell Douglas Framework to Plaintiff's Case

#### a. Prima Facie Case

Applying the *McDonnell Douglas* framework to the case at bar, we first

consider whether Brown has established a prima facie case of discrimination. There is no dispute that Brown belongs to a racial minority.

### 1. Adverse Employment Action

 As to the second element, the parties agree that Brown's termination constitutes an "adverse employment action." To conduct a proper analysis under the *McDonnell Douglas* framework, this Court finds it necessary to address whether any of Brown's other complaints constitute "adverse employment actions" for purposes of the *McDonnell Douglas* analysis.

A review of the record reveals a number of other actions which Brown challenges as adverse employment actions: (i) the unequal distribution of sales leads; (ii) the lack of notice of the territory assignment change; (iii) placement on a thirty-day PIP; and (iv) a host of other incidents, including Amstutz's failure to respond to Brown's requests for assistance in a complete and timely manner and Amstutz's requirement that Brown make twenty-five calls per day. Taking each of these actions in turn, the Court must determine whether any, some or all of these actions constitute "serious and material" changes in the terms, conditions or privileges of Brown's employment such that they had a "tangible adverse effect." *Davis*, 245 F.3d at 1238–39.

*Unequal Distribution of Sales Leads*

 Brown contends that Amstutz unequally distributed sales leads among the sales managers by giving him the "bottom leads," i.e. "some hospitals that weren't going to buy anything and didn't have any money." (Deposition of Brown at 188.) The receipt of sales leads is not documented as a term or privilege of Brown's employment, in either Brown's offer of employment letter or his 2001 Sales Incentive Plan. (Exhibit C, Offer of Employment Letter; Exhibit D, 2001 Sales Incentive Plan.) However, NEON/Sybase management acknowledges that a regional sales manager generally obtained sales prospects through cold calling *and the receipt of sales leads*, among other sources. (Deposition of Baehr at 62, emphasis added.) Thus, the lack of sales leads could have affected Brown's pipeline attainment and his ability to make sales, which in turn could have affected his ability to earn compensation in the form of commissions.

Critically, however, there is no evidence in the record as to the extent of impact, if any, that a lack of sales leads might have on a regional sales manager's attainment of a pipeline and ability to make sales. For example, there is no evidence showing that Brown's performance under Cowart, who he contends fairly distributed leads, was better than his performance under Amstutz. There is also no evidence that any of the leads given to the other sales managers, which Brown contends were of a better quality, ever materialized into pipeline opportunities or sales. Based upon the record, therefore, the Court would have to speculate on the extent of the impact of Amstutz's failure to distribute to Brown quality sales leads. Since, the asserted impact of a challenged employment action cannot be speculative under the *McDonnell Douglas* framework, see *Davis*, 245 F.3d at 1239, the Court concludes that Brown has not demonstrated that Amstutz's failure to provide Brown good sales leads was an "adverse employment action."

*Lack of Notice of Territory Assignment Change*

 Moving to the next challenged action, the Court considers the territory assignment change. Brown challenges Amstutz's failure to give him timely notice of the change. Brown appears to claim that Amstutz's failure to give him timely notice on June 8, 2001 was an "adverse employ-

ment action." Brown believes that Amstutz purposely misdirected the notification email to "Kevin" Brown so that he would not receive timely notice of the territory assignment change.

Even assuming that Amstutz's failure to notify Brown was purposeful, there is no evidence that the delay had a materially adverse effect on Brown's employment. Avery gave Brown notice of the territory change on the next business day. Additionally, Amstutz allowed Brown to keep any accounts in the previous territory in which he might have had a potential sale. (Deposition of Brown at 252.) Under these circumstances, the Court finds that Amstutz's delay in giving Brown notice of the territory change cannot constitute an adverse employment action. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 588–89 (11th Cir.2000) (finding that neither mistake in making an incorrect teaching assignment which was promptly corrected nor delay in returning visa application which caused no harm constituted adverse employment action).

*Placement on the PIP*

██ Next, the Court considers whether Brown's placement on a thirty-day PIP constitutes an "adverse employment action." Pursuant to Brown's PIP, he was required to accomplish the following: (I) achieve 100% of the 2001 second quarter quota; (ii) identify, qualify, and enter in the sales opportunity forecasting system 300% of the $1.3 million quota, i.e. $3.9 million, by the end of the third quarter; (iii) submit a weekly list of calls and prospecting activity to Amstuz; (iv) perform at least two in-person calls each week; and (v) perform at least one in-person call every two weeks with a new account customer executive and Amstutz. (Exhibit E.) Additionally, pursuant to the PIP, Brown was required to attend regular progress meetings with Amstutz and Pape. (Deposition of Brown at 246–47.) Amstutz in-

structed Brown to make 25 sales calls per day during the PIP period. (Deposition of Brown at 250.) Although Sybase treats the PIP as a form of "disciplinary action" under its policies and procedures manual, *see* Affidavit of Pape at 5, Brown's PIP was intended to "assist [Brown] [ ] in improving the skills and achieving the results necessary to perform satisfactorily at the level of Regional Sales Manager and to sustain that required level of performance thereafter." (Exhibit E.)

Notably, the Eleventh Circuit has held that an alteration in work responsibilities does not amount to adverse employment action when unaccompanied by tangible harm. *Davis*, 245 F.3d at 1244–45. Although Brown's placement on a PIP increased Brown's responsibilities and altered Brown's pipeline requirements, the change was unaccompanied by any tangible harm, such as a decrease in salary or a change in job title or classification. *Id.* Moreover, because his PIP was intended to assist Brown, the Court does not find that Brown's placement on a PIP was objectively adverse to Brown's employment. (Exhibit E.)

For these reasons, the Court finds that there is insufficient evidence from which it can be reasonably inferred that Brown's placement on the PIP constitutes an "adverse employment action." *See Fitch v. Continental Casualty Co.*, No. 01 C 1149, 2002 WL 31834877, at *5 (N.D.Ill.Dec.16, 2002) (holding that employee's placement on a PIP had no impact on employee's job rating and salary and thus was not adverse); *Cottman v. Rubin*, No. Civ. L–98–4067, 2001 WL 257830, at *3 (D.Md. Feb. 15, 2001) ("The Agency's decision to place him on a PIP cannot even remotely be considered an 'ultimate employment decision' and therefore is not actionable"), *aff'd*, 35 Fed.Appx. 53 (4th Cir.2002).

■ In concluding that Brown's placement on the PIP does not constitute an adverse employment action, the Court notes that there is insufficient evidence in the record from which it could be reasonably inferred that the reason for placing Brown on the PIP, i.e. his poor performance, was pretextual. (*See* discussion at A.2.c. of this Order; Affidavit of Pape ¶ 11; Affidavit of Amstutz ¶ 12.) Hence, even if this Court had found that Brown's placement on the PIP constituted an adverse employment action, it would still find that Brown could not prevail on his discrimination claim.

*The Other Alleged Incidents*

■ Brown also challenges several other incidents, detailed in the Response at pages 9–10. Under Eleventh Circuit law, albeit in the context of a Title VII retaliation claim, incidents can be considered collectively to determine whether they constitute prohibited discrimination. *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998). However, even viewed together, these incidents do not sufficiently alter the terms, conditions, or privileges of employment to constitute an adverse employment action. *Davis*, 245 F.3d at 1245–46.

In summary, the only "adverse employment action" that Brown suffered was his ultimate termination. With that in mind, we turn to the next issue of whether similarly situated employees were treated better.

**2. Similarly Situated Employees**

■ Brown asserts that three other individuals on his sales team, Hoffer, Kinney, and Avery, were similarly situated to him but treated better. Although it is true that these other salespersons were all terminated several months after Brown was terminated, a review of the record shows that there is insufficient proof from which to infer that they were similarly situated to Brown.

To demonstrate the "similarly situated" prong, Brown heavily relies upon the fact that Avery, like Brown, did not close any sales during his employment; yet Avery was not terminated until months later. (Response at 10–11.) However, a salesperson's ability to "close the sale" is only *one* aspect of a salesperson's performance. Eleventh Circuit precedent requires the Court to consider whether "the employees are similarly situated *in all relevant aspects*." *Knight*, 330 F.3d at 1316 (quoting *Holifield*, 115 F.3d at 1562) (emphasis added).

For example, in *Knight*, the Eleventh Circuit considered whether the plaintiff Knight had demonstrated that she was similarly situated to persons of a nonminority who were treated better. *Id.* at 1314–18. Knight was an African–American nurse who was placed on decision-making leave and later terminated. *Id.* Knight attempted to show that she was similarly situated to another nurse, Arnold, who was not placed on decision-making leave and was not terminated. *Id.* Knight presented evidence showing that Arnold had a similar history of behavioral problems. *Id.* The *Knight* court noted that had the employer's decision to place Knight on leave been based solely on Knight's behavioral problems then the Court might have concluded that the employees had been "similarly situated." *Id.* at 1317. However, the employer's decision, said the court, was based upon a review of Knight's entire record, including her performance and tardiness. *Id.* The court therefore determined that it was necessary to compare the two employees' records on the issues of their performance and tardiness. *Id.* Upon reviewing the employees' record, the court found that Knight and Arnold's problems with per-

formance and tardiness were quite different. *Id.* at 1318. As a result, the court concluded that Knight had not established a prima facie case of discrimination, despite the fact that Knight was similarly situated to Arnold on the issue of their history of behavioral problems. *Id.*

Applying the reasoning used by the Eleventh Circuit in *Knight*, if the decision to terminate Brown had solely been based on his failure to close sales, then the Court might find that Brown was similarly situated to Avery who was not terminated until months later. However, the record shows that Brown was terminated based on his failure to meet the requirements of his PIP, which included the requirement to attain a sufficient pipeline. (Affidavit of Pape ¶ 14; Deposition of Baehr at 39.) In fact, Brown's inadequate performance with respect to "pipeline attainment" was the particular reason that he was placed on a PIP. (Exhibit E, Brown's PIP.)

Turning to the record, however, there is an absence of proof from which to compare Brown's pipeline attainment to that of his comparators. Specifically, the record contains evidence of the *number of companies* in Brown's pipeline, but only the *dollar amounts* of the pipelines of his former team members. (Exhibit H.) That is, the record shows that "during the entire term of his employment, Plaintiff [Brown] had only two opportunities in forecasts and at any time four to six opportunities in his pipeline." (Affidavit of Amstutz ¶ 8.) However, the record does not contain any evidence of the number of companies in Hoffer, Kinney, or Avery's pipelines.

Similarly, the record shows the dollar amounts of Hoffer, Kinney, and Avery's prospects and forecasts, as follows: Hoffer had approximately $6 million in prospects and $3 million in pipeline forecasts; Kinney had $6 million in prospects and $1 million in pipeline forecasts; and Avery had approximately $1 million in prospects

and $3 million in pipeline forecasts. (Exhibit H to Defendant's Motion for Summary Judgment.) Notably, however, the record does not contain any evidence of the dollar amounts of Brown's pipelines, other than one $25,000 unrealized deal with Baptist Hospital. (Deposition of Brown at 248.)

With the present state of the record, the Court is being asked to compare apples to oranges; which it simply cannot and will not attempt to do.

Moreover, there is evidence of two key differences between Brown and his comparators. First, according to Pat Pape, who was the Director of Human Resources at the time, Brown "was the only sales manager [in Amstutz's team] who failed to make any sales *and* failed to keep any potential opportunities in his pipeline or forecast for any significant period of time." (Affidavit of Pape ¶ 10.) (emphasis added). Second, according to the deposition testimony of Tom Baehr, who was employed at NEON/Sybase as Vice President of Sales in the Eastern United States at the time, in late March or early April 2001, it was apparent that Brown "needed assistance, a lot more assistance than the other salespeople in terms of understanding our products and being prepared to sell them." (Deposition of Baehr at 9–10.) Additionally, at the time of Brown's termination, Brown was on a PIP, and his termination was based upon his failure to meet the terms of his PIP. At the time of Brown's termination, none of the other salespersons under Amstutz's supervision were also on a PIP.

In light of this evidence, the Court cannot conclude that Brown was similarly situated to other employees at Sybase that were treated differently. Nevertheless, for completeness, the Court will consider the last element of Brown's prima facie

case and continue its analysis under the *McDonnell Douglas* framework.

### 3. Job Qualification

■ There is no question that Brown has submitted evidence that he was qualified for the position of Regional Sales Manager. Brown had over three years of sales experience in the software marketplace prior to working for NEON, as well as technical experience. Although Sybase has proffered evidence showing that Brown did not succeed at his job, that evidence does not negate the evidence submitted by Brown that he was initially qualified for the job. Thus, making all reasonable inferences in a light most favorable to Brown, the Court finds that Brown has submitted sufficient evidence to make a prima facie showing that he was qualified for the position. Accordingly, we need not address Sybase's contention that Brown may not rely on *Damon v. Fleming Supermarkets, Inc.*, 196 F.3d 1354, 1360 (11th Cir.1999) and its progeny because Brown had not held his position for a "significant period of time." *Damon*, 196 F.3d at 1360.

### b. Legitimate, Nondiscriminatory Reasons

■ Brown concedes that Sybase has met its burden of producing legitimate nondiscriminatory reasons for terminating Brown's employment. Sybase terminated Brown's employment because he did not meet the requirements of his PIP and did not close any sales in his ten months of employment.

### c. Pretext

■ The Court next turns to the question of whether Brown has met his burden to come forward with sufficient evidence for a trier of fact to find that the reasons proffered by Sybase for terminating Brown were pretextual. To prove pretext, Brown must show that (1) the legitimate, nondiscriminatory reasons were

incredible; or (2) that the evidence produced by Brown permits a jury to find that racial animus was a more likely reason for the termination than the articulated, nondiscrimatory reason. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1332 (11th Cir.1998). As stated by the Eleventh Circuit, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030; *Alexander v. Fulton County*, 207 F.3d 1303, 1341 (11th Cir.2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated.").

Brown contends that he has met his burden by presenting the following evidence: (i) salespersons of other races were placed on PIPs at later times and under different terms than Brown; (ii) the low sales performance of all the members of Brown's team was due to the merger; (iii) Amstutz did not provide the same assistance, responsiveness, or sales leads to Brown that he gave to other salespersons; and (iv) John Valencia singled Brown out in a meeting and ridiculed him in front of the white salespersons on his team. (Response at 12–13.)

None of this evidence, however, undermines Sybase's stated concern about Brown's failure to meet the terms of his PIP and failure to make any sales as the reason for terminating him. First, the Court rejects Brown's attempt to show pretext by arguing that salespersons of other races were placed on PIPs under different terms than Brown. There is simply no evidence in the record as to the terms of the PIPs of other salespersons. Notably, the names of the individuals whose PIPs are in the record have been redacted.

The Court similarly rejects Brown's second asserted attempt to show pretext. It may be true that Brown's performance might have been poor simply because of customer reaction to the merger. However, the Court is simply not in a position to second-guess Sybase's decision to assume that risk and terminate Brown.

The other evidence, namely Amstutz's failure to provide the same assistance to Brown and John Valencia's speech to Brown at a sales meeting, is also insufficient evidence from which a jury could conclude that racial animus was the more likely reason for Brown's termination. The record shows that Amstutz offered Brown sales advice and leads. (Deposition of Brown at 188, 250.) Brown questioned only the success of Amstutz's sales approaches and the quality of the leads. (Deposition of Brown at 188, 250.) There is no evidence, however, that the leads that Amstutz gave to the other salespersons ever materialized into sales, or that the assistance that Amstutz gave to the other salespersons was demonstrably better. Additionally, although Amstutz may not have returned some of Brown's phone calls, there is no evidence of his usual telephone etiquette, including whether he returned phone calls made by the white salespersons on Brown's team.

As to the April sales meeting, it appears that Valencia singled Brown out because he was the only one who had not made any sales and yet had been with the company for seven months, while Kinney and Hoffer had pipelines to report and Avery had not been with the company as long. (Deposition of Brown at 240–41.) If anything, this evidence supports Sybase's position that it terminated Brown's employment due to his poor performance.

In summary, none of the evidence presented by Brown, even when viewed in a light most favorable to Brown, places Sybase's proffered reason for Brown's termination into sufficient doubt to create a jury question. The unrebutted evidence is that Brown "was the only sales manager who failed to make any sales *and* failed to keep any potential opportunities in his pipeline or forecast for any significant period of time." (Affidavit of Pape ¶ 10.) Consequently, he was the first sales manager to be placed on a PIP and terminated.

For these reasons, the Court concludes, as a matter of law, that Brown has not prevailed on his race discrimination claim and that Sybase is entitled to summary judgment on Count I of the Amended Complaint.

## B. Retaliation Claim under The Florida Civil Rights Act

### 1. Legal Framework

Brown also asserts a claim for retaliation under The Florida Civil Rights Act of 1992 ("FCRA"). (Amended Complaint at 7–8.) Brown contends that Sybase terminated him and otherwise subjected him to adverse employment action because he complained to Human Resources that Amstutz made a racial comment. (Response at 1.)

 To establish a prima facie case for retaliation under the FCRA, Plaintiff must show that: " 1) he engaged in protected activity; 2) he suffered adverse employment action; and 3) there is some causal relationship link between his protected activity and the adverse employment action." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir.1997).[1] "To recover for retalia-

---

1. "The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998) (citing Florida cases).

tion, the plaintiff 'need not prove the underlying claim of discrimination which led to [her] protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed." *Holifield*, 115 F.3d at 1566 (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir.1989)).

■■■ "Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions." *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998). "Conduct that falls short of ultimate employment decisions must meet 'some threshold level of substantiality ... to be cognizable under the anti-retaliation clause.'" *Gupta v. Florida Bd. Of Regents*, 212 F.3d 571, 587 (11th Cir.2000) (quoting *Wideman*, 141 F.3d at 1456). At a minimum, the asserted action must be objectively serious and tangible enough to alter the employee's compensation, terms, conditions, or privileges of employment, deprive the employee of employment opportunities, or adversely affect his status as an employee. *See id.*

■■■ "To meet the causal link requirement, the plaintiff 'merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Holifield*, 115 F.3d at 1566 (quoting *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571–72 (11th Cir.1993)). However, "[t]he plaintiff must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff" and "[t]he employer's awareness of the statement may be established by circum-

stantial evidence." *Holifield*, 115 F.3d at 1566 (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir.1991)).

Once the plaintiff establishes his prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Holifield*, 115 F.3d at 1566 (citing *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571–72 (11th Cir.1993)). If the employer offers legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation. *Holifield*, 115 F.3d at 1566 (citing *Meeks*, 15 F.3d at 1021; *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993)). However, the Supreme Court has held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### 2. *Application of Law to Plaintiff's Case*

■■■ In this case, Sybase acknowledges that Brown engaged in protected activity when he reported Amstutz's racial comment to Human Resources, and that Brown suffered an adverse employment action. The parties concede that termination constitutes an adverse employment action.[2] Thus, to establish his prima facie case, Brown need only establish that there

---

2. The Court finds, even under the lighter burden in retaliation cases, that Brown has not established that his placement on the PIP or any of the other challenged actions meets the "threshold level of substantiality" to constitute an adverse employment action. *Gupta,*

212 F.3d at 587 (quoting *Wideman,* 141 F.3d at 1456). (*See* discussion at A.2.a.1 above.) Even if the Court viewed these other challenged actions as adverse employment actions, its ultimate conclusion would not be different.

is a causal connection between the protected activity and Brown's termination.

Brown reported his complaint to Human Resources on March 13, 2001. On March 20, 2001, Baehr sent Amstutz an internal memorandum admonishing him for the racial comment. (Deposition of Baehr at 24.) On April 16–17, 2001, Amstutz attended a racial awareness workshop. (Exhibit I.) On May 11, 2001, Baehr received confirmation of Amstutz's attendance and an invoice for the workshop, and on June 5, 2001, Pat Pape of Human Resources authorized payment for the workshop. (Exhibit I.) On June 5, 2001, Brown was placed on a PIP. (Exhibit E.) Finally, on July 9, 2001, Brown was terminated. (Exhibit G.) The decision to terminate Brown was made by Tom Baehr, Vice President of Sales in the Southeastern United States, and John Valencia, Senior Vice President of Sales at the beginning of July 2001. (Affidavit of Pape ¶ 14; Exhibit G, Letter dated July 6, 2001 from Baehr to Brown.)

The parties concede the fact that Baehr and Valencia were aware of Plaintiff's complaint to Human Resources. *See* Defendant's Reply at 9. The parties also concede that Sybase has articulated a legitimate, non-retaliatory reason for the termination: Brown's failure to meet the terms of his PIP and his failure to make sales. However, even assuming that the Court found a causal connection between Plaintiff's complaint of the racial comment and his termination four months later, the Court finds that there is insufficient evidence of pretext in this case.

Brown contends that the following facts demonstrate pretext: (I) inconsistent evidence as to who made the decision to place Brown on a PIP; (ii) the fact that it was unrealistic to expect that Brown could make any sales during his thirty-day period since the life cycle of Sybase's product was sixty-days; (iii) Amstutz's failure to give notice of the territory change; (iv) the requirement that Brown had to make twenty-five telephone calls per day; and (v) Amstutz's failure to document counseling sessions he had with Brown prior to placing him on a PIP. The Court takes each of these pieces of evidence in turn.

First, although there is inconsistent evidence as to who placed Brown on a PIP, there is no uncertainty in the record as to the stated reason why Brown was placed on a PIP: his poor performance. The fact that there may be inconsistencies as to who placed Brown on a PIP does not bear on the issue of whether Sybase's reason for its termination decision was pretextual.

Second, although Brown was placed on a thirty-day PIP, there is evidence in the record that the other six individuals who were placed on thirty-day PIPs were all white. (Affidavit of Pape ¶ 6, attached to Reply.)

Third, as discussed above, the Court finds no evidence of deceit or trickery in Amstutz's failure to provide Brown notice of the territory assignment change. As evidenced by the similarities in the Plaintiff's name and the person to whom the email was sent, the Court finds that there is reason to believe that the delay in notice of the territory change was the result of Amstutz's email mistake. (Amstutz Affidavit ¶ 22.) Moreover, even if purposeful, Amstutz's failure to give timely notice of the territory change does not show that Sybase's reason for terminating Brown was for any reason other than poor performance and his failure to meet the terms of his PIP. Fourth and similarly, the requirement that Brown make twenty-five telephone calls per day does not show that Sybase's reason for terminating Brown was pretextual.

Finally, although Brown contends that Amstutz's failure to document verbal counseling sessions violated Sybase's policies and procedures, the policies and proce-

dures manual also clearly states that such verbal counseling sessions were unnecessary and that Sybase could terminate employment without any warning or counseling at all. (Exhibit A.) Moreover, there is no evidence that Amstutz documented his counseling sessions with the white salespersons at Sybase.

In summary, none of the foregoing evidence rebuts Sybase's position that it terminated Brown's employment for his poor performance and his failure to meet the terms of his PIP. Accordingly, the Court finds that Brown has failed to prevail on his claim for retaliation under the FCRA and, therefore, that Sybase is entitled to summary judgment on Count II of the Amended Complaint.

### IV. Conclusion

The Court concludes that Brown has failed to prevail on his claims of race discrimination or retaliation. Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant' Motion for Summary Judgment (DE 47) is hereby **GRANTED.**

2. The Court will separately enter judgment for the Defendant.