**Jim VICKERS, Plaintiff,**

v.

**Alan EGBERT, et al., Defendants.**

**No. 04–10030–CIV–MOORE.**

United States District Court,
S.D. Florida.

Feb. 25, 2005.

Jim Vickers, pro se, Marathon, FL, for Plaintiff.

Jonathan A. Glogau, Chief, Complex Litigation, Tallahassee, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

K. MICHAEL MOORE, District Judge.

THIS CAUSE comes before this Court for final disposition after a one and a half hour bench trial in Key West, Florida, on January 13, 2005. Plaintiff, Jim Vickers, proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 against the State of Florida, its Governor (Jeb Bush), an agency of the State (the Fish and Wildlife Conservation Commission ("FF & WCC")), and the FF & WCC's Executive Director (Alan Egbert).

Plaintiff sued Defendants for injunctive relief, claiming: (1) the application of one of Florida's licensing requirements for commercial fishers violated his equal protection rights; (2) the trap certificate program in place for both lobsters and stone

crabs results in Fifth Amendment takings; and (3) his equal protection rights were violated when his disaster relief assistance application was denied.

Defendants moved to dismiss the Complaint, and this Court granted, in part, Defendants' motion. The case was dismissed against the State of Florida and the FF & WCC, because suit against these two Defendants is barred by the Eleventh Amendment of the United States Constitution. The case was also dismissed against Governor Bush, as he had no connection to the enforcement of the challenged laws, therefore there was no case and controversy between Governor Bush and Plaintiff. In addition, suit against Governor Bush is barred by the Eleventh Amendment. The case was dismissed against the former FF & WCC Executive Director, Alan Egbert, and the current Executive Director, Ken Haddad, was substituted to proceed in this case for prospective injunctive relief pursuant to *Ex parte Young*, 209 U.S. 123, 127, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Plaintiff's claim for payment from the Disaster Relief Fund was also dismissed. *See* Nov. 2, 2004 Order (DE # 28).

This Court, having heard the trial testimony, having reviewed the applicable pleadings,[1] received the evidence, and reviewed the applicable law, makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff is a commercial fisherman in the Florida Keys, in Monroe County, Florida. He has been in the commercial fishing business for approximately ten years. He has maintained a valid State of Florida saltwater products license, restricted species endorsement and crawfish license during all times relevant to this suit. His primary source of income comes from catching and selling lobster. Trial Tr. at 4.

2. At some point after the inception of the lobster trap tag program, Plaintiff was allocated 61 trap certificates. During the '98–'99 season, there was an across-the-board reduction, in which Plaintiff's lobster trap certificates were reduced from 61 to 55. During the '02–'03 season, there was another across-the-board reduction, and Plaintiff's traps were reduced from 55 to 53. *Id.* at 12–13. At the beginning of the '02–'03 lobster season, Plaintiff purchased 472 lobster trap certificates from a private individual. He paid $40 per certificate, for a total of $18,880. On September 5, 2002, Plaintiff mailed a check to the FF & WCC for $944, to pay for the $2 per certificate transfer fee. FF & WCC subsequently issued Plaintiff 354 trap certificates, 118 less than what he had purchased from the private individual. *Id.* at 6; *see also* Plaintiff's Ex. 1. This 25% reduction was a result of the program by the FF & WCC, in which a 25% reduction was implemented on the transfer of tags outside of a fisher's immediate family. Trial Tr. at 29. At the time of the trial, Plaintiff had been allocated 519 lobster traps. *Id.* at 13–14.

3. Plaintiff's witness, Miguel Estepa, testified that during the '02–'03 season, he suffered a reduction of 27 traps. However, during the '04–'05 season, Estepa purchased 500 traps, which were not reduced

---

1. The Court has considered Plaintiff's Motion to Allow Untimely Filing and Memorandum of Law filed on January 18, 2005. The Court finds no merit to Plaintiff's arguments. First, the "Fruit of the Poison Tree Doctrine" is inapplicable here. Second, fishing, whether commercial or recreational, is not a fundamental right, and those engaged in this activity are not a suspect class. *See infra* ¶ 2 of Conclusions of Law. Finally, as explained *infra*, the $5,000 sales requirement for a restrictive species endorsement, the lobster trap tag and stone crab trap tag programs are rationally related to a legitimate state objective, and are not arbitrary or capricious.

by the FF & WCC. *Id.* at 17; Plaintiff's Ex. 2. Estepa's testimony is consistent with the testimony of Defendant's witness, Roy Williams, the leader of the marine fisheries management section of the FF & WCC. Williams testified that during the '02–'03 season, there was a total reduction to 4% annually, achieved by a combination of 25% "passive" reductions upon transfer of tags outside of a fisher's immediate family, and an across-the-board reduction at the end of the season, if necessary, to bring the total up to the 4% level. Trial Tr. at 29–30; *see infra* ¶ 8, Findings of Fact. Williams also testified that the reduction program was suspended for three years beginning in the '04–'05 season. Trial Tr. at 30; *see infra* ¶ 8.

4. At the inception of the stone crab trap tag program, Plaintiff was allocated 165 tags, consistent with the rules and laws in effect at that time. He appealed his allocation to the administrative appeals board but was afforded no relief. Plaintiff's treatment at the appeals board was consistent with treatment of other fishers—no one was allocated more tags for the reasons asserted by the Plaintiff at the time. Trial Tr. at 11–12.

5. To qualify for a restricted species endorsement, *i.e.,* a commercial fishing license, fishers must prove that he or she sold at least $5,000 worth of fish to a State approved wholesale dealer within a one year period.[2] Plaintiff claims that the majority of approved wholesale dealers have large fleets of their own boats, and refuse to buy fish from small independent fishers. In addition, the approved wholesale dealers have complete discretion to choose which product they will purchase, and what price they will pay for it. Plaintiff claims that this varies from fisher to fisher. For example, an approved wholesale dealer may pay $5 per pound of product to one fisher, but $5,000 per pound to another fisher. *Id.* However, Plaintiff concedes that the price that these approved wholesale dealers pay to the fishers is not within the control of the FF & WCC. *Id.* at 15–16.

6. The $5,000 sales requirement for issuance or renewal of a restricted species endorsement is designed to differentiate between commercial and recreational fishers. This distinction is needed to allow the FF & WCC to regulate the taking of fishery resources. Recreational fishers are limited to relatively small bag limits not applicable to commercial fishers who, in some cases are limited by much larger trip or landing limits. Requiring $5,000 of sales in one of the previous three years is a *de minimis* requirement for holding commercial fishing privileges. Although other methods could be adopted to accomplish the FF & WCC's goal of differentiating between commercial and recreational fishers, a sales requirement is a reasonable choice. *Id.* at 23–25.

7. The lobster fishery has a potential annual yield of 6–7 million pounds. In the years leading up to the institution of the lobster trap tag program, the number of traps in the water catching this amount increased from about 250,000 to over one million. This overcapitalization of this fishery created serious problems, including: (1) increased congestion and conflict on the water; (2) excessive mortality of undersized lobsters used as attractants in the traps; (3) a declining yield per trap; and (4) public concern over petroleum and debris pollution from existing traps. *Id.* at 26–28.

8. In 1992 the legislature created the lobster trap certificate program, and ini-

---

**2.** To qualify for a restricted species endorsement, a fisher has to demonstrate every three years that he or she made at least $5,000, *or* 25% of his or her income, whichever is less. Trial Tr. at 23–24.

tially authorized 700,000 tags (increased in a subsequent year to 750,000), a significant reduction right at the start, and authorized the FF & WCC to reduce the numbers yearly by a maximum of 10%. In the initial years of the program ('93–'94), there was an across-the-board reduction of 10% imposed. There was no reduction during the '96–'97 season. In 1999, 2000, and 2001, there was also no reduction.[3] In 2002 and 2003, the program was changed from an across-the-board reduction of 10%. Instead, the total reduction was reduced to 4% annually achieved by a combination of 25% "passive" reductions upon transfer of tags outside of a fisher's immediate family, and an across-the-board reduction to bring the total up to the 4% level. This reduction program was suspended for the '04–'05 through '06–'07 fishing years to allow the FF & WCC to study changes to the fishery caused by large increases in landings by commercial fishers using diving methods rather than traps. Although the reductions have not been applied continuously since the inception of the program, the reasons for making changes are rational. *Id.* at 28–30.

9. In the stone crab fishery, a similar rapid increase in the number of traps in the water occurred. This fishery has a potential annual yield of 3–3.2 million pounds of stone crab claws. This level of harvest was previously achieved with about 600,000 traps. By the time the program was adopted by the FF & WCC in 2000, there were 1.2 to 1.3 million traps in the water and the numbers were growing annually. The excessive number of traps in the water caused declining yields per trap, and an increase in conflicts between stone crab trappers and shrimp trawlers. The FF & WCC adopted the trap tag program to generate an optimum sustainable yield utilizing the fewest number of traps. *Id.* at 30–31.

10. Fishers were initially allocated stone crab tags based on the number of traps listed on their saltwater products license applications or the number of pounds landed divided by 2 in any of three target years ('95–'96, '96–'97, '97–'98). An appeals board was created with power to allocate extra tags to fishers with hardships or extenuating circumstances. No fisher was allocated extra tags based on claims similar to those of the Plaintiff. *Id.* at 32–33

### CONCLUSIONS OF LAW

1. Plaintiff's remaining claims in this case amount to substantive due process claims against the lobster and stone crab trap tag programs, as well as a substantive due process challenge to the $5,000 sales requirement for maintenance of a restricted species endorsement. There also appears to be an equal protection claim. All of these claims are tested against the rational basis test. *United States v. Plummer*, 221 F.3d 1298, 1308–1309 (11th Cir.2000)(explaining that "under substantive due process jurisprudence, a statute or regulation will be upheld so long as it is rationally related to a lawful governmental purpose and is not unlawfully arbitrary or discriminatory"); *Rivera v. Allin*, 144 F.3d 719, 727 (11th Cir.1998)("If a law neither burdens a fundamental right nor targets a suspect class, it does not violate the Fourteenth Amendment's Equal Protection Clause, as incorporated through the Fifth Amendment's Due Process Clause, so long as it bears a rational relation to some legitimate end.") (citations and quotations omitted); *Villas of Lake Jackson v. Leon County*, 121 F.3d 610, 614–615 (11th Cir. 1997).

2. Fishing, whether commercial or recreational, is not a fundamental right

3. The record is silent as to whether or not there was a reduction in 1998.

and those engaged in these activities are not a suspect class. *Sisk v. Texas Parks & Wildlife Dep't,* 644 F.2d 1056, 1058 n. 5 (5th Cir.1981)(holding that fishing is not a fundamental right); *United Boatmen of NJ v. Mosbacher,* 1992 WL 13197, \*10, 1992 U.S. Dist. LEXIS 664, \*26–27 (D.N.J.1992)(holding that because recreational fishing is not a fundamental right, the rational basis test is the correct standard for determining whether the relevant regulations violate due process, *i.e.* whether the regulation bears a rational relationship to a legitimate government goal); *La-Bauve v. Louisiana Wildlife & Fisheries Comm'n,* 444 F.Supp. 1370, 1382 (E.D.La.1978)(holding that the property interest in confiscated fishing nets and the property and liberty interests in the pursuit of a livelihood are not fundamental interests requiring strict scrutiny); *Gilbert v. Department of Fish & Game, Bd. of Fisheries,* 803 P.2d 391, 399 (Alaska 1990)(noting that the right to engage in commercial fishing is an important economic right, it is not a fundamental right); *California Gillnetters Assn. v. Dep't of Fish & Game,* 39 Cal.App.4th 1145, 1154–55, 46 Cal.Rptr.2d 338 (Cal.Ct.App.1995)(stating that "the courts have repeatedly held that legislative enactments affecting the 'right to work' are tested under a rational basis and not the strict scrutiny analysis because there is no fundamental right to work"); *Lane v. Chiles,* 698 So.2d 260, 263 (Fla.1997)(because fishing is not a fundamental right and commercial fishermen do not constitute a suspect class, the rational basis test applies); *State v. Weaver,* 805 So.2d 166, 170 (La.2002)(stating that "status as commercial fisherman does not constitute a suspect class, nor does commercial fishing amount to a fundamental right").

 3. The State of Florida's interests addressed by these laws are the protection of natural resources, the regulation of the exploitation of state wildlife resources and the regulation of the industry for efficiency purposes. These are unquestionably legitimate state interests. *Sisk,* 644 F.2d at 1058 n. 5 (stating that the State of Texas may regulate the commercial exploitation of its wildlife resources); *Solis v. Miles,* 524 F.Supp. 1069, 1074 n. 6 (S.D.Tex.1981)(finding that the allocation of natural resources is a legitimate state interest); *Lane,* 698 So.2d at 263(protection of the state's natural resources is a valid state objective)..

4. Based on the facts as set forth above, the challenged regulations are rationally related to the legitimate state interests of natural resource protection and the regulation of the exploitation of the state's natural resources. In addition, the challenged regulations are *not* arbitrary and capricious.

 5. As to Plaintiff's equal protection claim, the facts show that he was allocated the amount of tags specified by the rules and regulations. He was not singled out for disparate treatment based on some invidious discrimination by the Defendant, and therefore he does not state a claim for equal protection violation. *Bell v. Duperrault,* 367 F.3d 703, 707 (7th Cir. 2004)("[E]qual protection claims may also involve a 'class of one,' where the plaintiff alleges that only he 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' "); *see also Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). The "class of one" plaintiff bears the burden of proving that he has suffered intentional, irrational, and arbitrary discrimination.

6. Although Plaintiff alleged that he and Estepa were treated differently, it is clear that both Plaintiff and Estepa suffered a 25% lobster trap tag reduction during the '02–'03 season. Estepa did not

suffer a lobster trap tag reduction during the '04–'05 season, but as Estepa testified to, no fisher suffered a reduction during the '04–'05 season. Contrary to Plaintiff's claims, the fact that he suffered a reduction in '02–'03 and Estepa suffered no reduction in '04–'05 does not show that he suffered intentional, irrational, and arbitrary discrimination, or that he was singled out for disparate treatment based upon some invidious discrimination by the Defendant.

## CONCLUSION

Plaintiff has failed to show that the $5,000 sales requirement for a restricted species endorsement, the lobster trap tag or the stone crab trap tag programs are not rationally related to a legitimate state objective or that they are arbitrary and capricious. Plaintiff has also failed to show any invidious discrimination in the FF & WCC's treatment of him in any of these programs. Therefore, Plaintiff's claims must be dismissed with prejudice and judgment is entered for the Defendant.

Accordingly, it is

ORDERED AND ADJUDGED that judgment is hereby entered in favor of the Defendant. This case is DISMISSED WITH PREJUDICE. The Clerk of Court is directed to CLOSE this case. All pending motions not otherwise ruled upon are DENIED AS MOOT.