[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 21, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12370

_____

D. C. Docket No. 05-00684-CV-WSD-1


GRIFFIN INDUSTRIES, INC.,

Plaintiff-Appellee,

versus

TOMMY IRVIN,
in his official capacity as Commissioner of the
Georgia Department of Agriculture and in his
individual capacity,
LEE MYERS,
in his official capacity as Commissioner of the
Georgia Department of Agriculture and in his
individual capacity, et al.,

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

**(August 21, 2007)**

Before HULL and MARCUS, Circuit Judges, and BARZILAY,[*] Judge.

MARCUS, Circuit Judge:

This unusual civil rights case presents the question, on interlocutory appeal, whether the defendants, who are state environmental regulators and local political actors, may be held liable for violations of the Equal Protection Clause for taking regulatory action against an industrial facility. Griffin Industries, which owns a chicken rendering plant in East Dublin, Georgia, brought a section 1983 suit against various state and local defendants on the theory that the defendants violated its constitutional right to equal protection by "disparately treat[ing] and disparately regulat[ing] Griffin Industries in a way that its competitors . . . are not treated or regulated." Compl. ¶ 20. After careful review, we reverse the district court's order denying the defendants' motions to dismiss and hold that the defendants were entitled to qualified immunity.

## I. BACKGROUND

When we review the district court's denial of qualified immunity at the motion to dismiss stage, we accept, as we must, the factual allegations in the complaint as true and draw all reasonable inferences therefrom in the plaintiff's

---

[*]Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

favor. Dacosta v. Nwachukwa, 304 F.3d 1045, 1047 (11th Cir. 2002). With this standard in mind, we provide the factual background of the case before proceeding to outline the specific allegations Griffin made against the individual defendants.

### A.    Factual Overview

Griffin Industries, Inc., a Kentucky corporation, owns a chicken rendering plant in East Dublin, Georgia, a town in east-central Georgia about halfway between Atlanta and Savannah. The East Dublin facility processes animal waste products such as chicken feathers, bones, blood, grease, and carcasses into commercial products used in animal feeds, cosmetics, fertilizers, and other products. Griffin has owned the facility since 1981.

Beginning in the late 1990s, the plant saw a substantial increase in the number of odor complaints coming from local residents. More people had moved into the area near the plant, and Griffin had entered into contracts with significant poultry producers in the state, increasing the plant's rendering volume. According to Griffin's complaint, local officials including East Dublin Mayor George Gornto and attorney Joshua Kight then began trying to limit or end rendering operations at the plant. Specifically, Griffin claimed that the defendants encouraged residents and businesses to file odor complaints against Griffin, required the plant to

3

participate in an odor study conducted by the Georgia Institute of Technology, published editorials attacking Griffin in the local newspaper, and utilized the East Dublin Police Department to intimidate and harass the company.

Griffin said that these efforts intensified in 2002, when state regulators at the Georgia Department of Agriculture (GDA) and the Environmental Protection Division (EPD) of the Georgia Department of National Resources became involved in a conspiracy against it. Griffin alleged that EPD Director Harold Reheis, GDA Commissioner Tommy Irvin, and GDA Assistant Commissioner Lee Myers joined Gornto and Kight in the conspiracy. Dubose Porter, who represented the district including East Dublin in the Georgia General Assembly and is co-owner and editor of the Dublin Courier-Herald, was also alleged to have participated.

On August 6, 2002, the EPD issued a draft permit for the Griffin facility pursuant to Title V of the Clean Air Act, 42 U.S.C. §§ 7661–7661f.[1] Griffin objected to certain aspects of the draft Title V permit, and EPD and Griffin

---

[1] Title V permits are generally issued by state authorities acting pursuant to the Federal Clean Air Act. According to the United States Environmental Protection Agency (EPA), the "purpose of Title V permits is to reduce violations of air pollution laws and improve enforcement of those laws" by (1) "recording in one document all of the air pollution control requirements that apply to the source," (2) "requiring the source to make regular reports on how it is tracking its emissions of pollution and the controls it is using to limit its emissions," (3) "adding monitoring, testing, or record keeping requirements, where needed to assure that the source complies with its emission limits or other pollution control requirements," (4) "requiring the source to certify each year whether or not it has met the air pollution requirements in its title V permit," and (5) "making the terms of the title V permit federally enforceable." See EPA, Air Permits: Basic Facts, at http://www.epa.gov/air/oaqps/permits/.

4

negotiated over the permit that fall. Griffin and the EPD eventually reached voluntary agreement on the permit on October 29, 2002, just prior to a public hearing. At the hearing, however, local officials strongly objected to the draft permit and pushed for stronger odor regulations. Subsequent Title V permit drafts were issued on September 9, 2003, and December 24, 2003. According to Griffin, the December 24 permit contained new odor control provisions more stringent than those imposed on any other chicken rendering facility in the state.

In addition to the air quality regulations in the Title V permit, the Griffin plant is subject to water quality controls. Wastewater generated at the plant during the rendering process is pumped through a series of ponds or lagoons for purification and then sprayed onto an irrigation field through a land application system (LAS). This LAS is operated under a permit from the EPD that requires Griffin to track and record the timing and volume of sprays, along with the quality of the water being sprayed on the field. There are prohibitions on spraying when the field is saturated to prevent water from running off into local streams, and testing of the underlying groundwater through monitoring wells is also required.

In May 2000, the EPD issued Griffin a new LAS permit that allowed Griffin to triple the volume of water sprayed on the field. On March 14, 2003, however, the EPD issued an "emergency order" suspending this permit. Griffin challenged

the suspension in proceedings before a state administrative law judge. According to the complaint and its attachments, the judge found that the EPD had established "that numerous events occurring around the first part of 2003 made it suspect for the first time that there might be problems with the operation of East Dublin's LAS and with the reliability of the data which it had received in the past from the East Dublin plant." Compl. Ex. U at 9. While acknowledging that these events gave rise to "unanswered questions" regarding the operation of Griffin's land application system, the administrative judge concluded that the EPD had failed to prove, by a preponderance of the evidence, that the suspension order was justified by a "substantial and imminent threat" to water quality or public health. Id. at 9–10. Accordingly, the judge revoked the EPD's emergency order suspending Griffin's LAS permit on April 29, 2003.

Griffin alleged that the defendants have nevertheless continued to discriminate against the plant since the revocation of the emergency order, "harassing it and . . . imposing additional burdens on Griffin industries that are not imposed on similarly situated rendering facilities," "selectively and maliciously prosecut[ing] Griffin Industries," and "depriving Griffin Industries of its property rights." Compl. ¶¶ 100–02.

**B.     Alleged Conduct of Specific Defendants**

Griffin brought this section 1983 suit against a group of state and local officials on March 11, 2005. The defendants involved in this interlocutory appeal,[2] and the factual allegations pertaining to each of them, are detailed below.

**1.     George Gornto**

George Gornto is the mayor of the City of East Dublin. Griffin claimed that Gornto hoped to "curry political favor" and increase the value of real estate he owned near the Griffin plant by working to shut it down. Specifically, Gornto was said to have pushed East Dublin residents to file odor complaints against Griffin; pressured state regulators to act against the plant; engaged a lawyer, Joshua Kight, to pursue legal remedies against Griffin; used the East Dublin Police Department to monitor activity at the facility, including the operation of the LAS; and generally conspired with the other defendants against Griffin.

**2.     DuBose Porter**

---

[2] In addition to Gornto, Porter, Kight, Reheis, Irvin, and Myers, the complaint named several defendants who are not parties to this appeal. These include Carol Couch, Reheis's successor as EPD commissioner; twenty unnamed "Defendants Does 1-20" accused of participating in the conspiracy; and two municipalities, Laurens County and the City of East Dublin. Laurens County and the City of East Dublin are not part of this interlocutory appeal because they do not enjoy the protection of qualified immunity. Couch is not a party because Griffin's official capacity claim against her was dismissed by the district court.

Dubose Porter holds a seat in the Georgia General Assembly and is co-owner and editor of the Dublin Courier-Herald. Like Gornto, Porter allegedly acted against Griffin to advance his personal interests, increase the value of real estate near the plant held by business associates, and generally "curry political favor." Compl. ¶ 31. Griffin specifically claimed that Porter "used the power of his office to demand that Griffin Industries participate in a University of Georgia/Georgia Institute of Technology 'odor study'" in 2000. Id. ¶ 33. The complaint further described conduct including meeting with state environmental regulators concerning the plant, publishing hostile editorials and articles in his newspaper, and telephoning a Griffin vice president to warn that regulatory action would be forthcoming if the odor problem was not resolved. Finally, Griffin claimed that Porter persuaded EPD to move up the date of a public hearing on Griffin's Title V permit to benefit his 2002 reelection campaign.

3.    Joshua Kight

Joshua Kight is a private attorney who was engaged by Gornto, East Dublin, and Laurens County in the campaign against Griffin. Griffin alleged that Kight incited an investigation by the federal Environmental Protection Agency by presenting the agency with an affidavit, signed by a former Griffin employee, that

8

contained false statements. On February 20, 2003, the EPA executed a search warrant at the East Dublin plant. Griffin and several corporate executives were subsequently indicted on criminal environmental law charges. According to Griffin's complaint, these charges were later dropped.

On the very day the EPA search was conducted, Kight released a report on his investigation of Griffin for Mayor Gornto and the Laurens County Board of Commissioners. Kight's report, which was attached as an exhibit to the plaintiff's complaint, said that Griffin improperly disposed of solid waste from the plant at a local landfill, left tons of partially rendered animal waste to rot outside the plant during the summer of 2002, contaminated groundwater and a local creek, and falsified the LAS spraying records. According to the complaint, the report "demanded that Griffin Industries' LAS Permit be suspended and that the Georgia Attorney General open an investigation into why Defendant EPD had not more strictly regulated the Dublin Facility." Id. ¶ 80.

Griffin also alleged that Kight acted improperly in preparing the report. Specifically, it said that Kight, joined by Gornto, "had third parties trespass on the Dublin Facility to obtain water samples,"[3] and that Kight and Gornto used the East

---

[3] The trespassing allegation may relate to the report's statement that a volunteer had agreed to collect water samples "from what at the time was believed to be an intersecting tributary to Bay Branch [Creek] downstream of the Griffin property." According to the report, the volunteer later discovered that the apparent tributary "was actually a drainage ditch that was

9

Dublin Police Department to intimidate and harass it.[4] Finally, the complaint

alleged that Kight involved American Proteins, Griffin's business competitor, in

his efforts against the East Dublin plant. Griffin says that Kight "discussed

strategies to attack Griffin Industries with American Proteins President Tommy

Bagwell," and that he discussed the possibility of filing lawsuits against the plant

"with a person who[m] he believed to be a Griffin Industries[] competitor."

Compl. ¶ 74. On April 11, 2003, Kight, as counsel for four named plaintiffs, filed a

class action suit in state court against Griffin on nuisance grounds. It is unclear

whether this suit was the subject of the alleged discussion with a Griffin

competitor, and the complaint does not discuss the present status of the suit or say

whether the suit was filed pursuant to Kight's engagement on behalf of East Dublin

and Laurens County.


4.      Harold Reheis

Harold Reheis served as director of the Georgia Environmental Protection

Division until his retirement in mid-2003. Griffin's primary allegation against

---

fed by spray field run-off," running "like a creek down a hill into Bay Branch." Compl. Ex. R at 6–7.

[4] Kight's report did indicate police involvement in the preparation of the report. It stated that the East Dublin Police Department maintained a log of the plant's LAS spraying activity and that a comparison of the police department's logs with Griffin's official reports to the EPD showed discrepancies indicative of underreporting of spraying volume. Compl. Ex. R at 5–6.

Reheis was that he took adverse regulatory action to harm the company. The complaint alleged that Reheis met with co-defendants Porter, Gornto, and Kight in February 2003 "to discuss further strategies that they could employ to put the Dublin facility out of business."

Griffin complained that these strategies focused on Griffin's LAS (water quality) and Title V (air quality) permits. More specifically, Griffin claimed that Reheis helped advance Porter's re-election campaign by changing the date of a public hearing on Griffin's Title V permit. The complaint quoted an email from one EPD employee to another stating that "Harold," presumably referring to Reheis, was "open to the idea of having the hearing earlier and wanted to discuss the matter with State Representative Dubose Porter before determining whether it was better to have the hearing before the election or after." Compl. Ex. D. Griffin also attached a second internal EPD email, dated some two months after the first, about "sit[ting] down with Harold Reheis . . . to make sure that Harold agrees with the [Title V] permitting strategy as we might well be going 'outside the box.'" Compl. Ex. P. Finally, when the EPD suspended Griffin's LAS permit on March 14, 2003, Griffin said that Reheis personally notified Kight of the suspension.


5.    Tommy Irvin

11

Tommy Irvin is the Commissioner of the Georgia Department of Agriculture. Griffin said that Irvin attended a meeting on August 5, 2002, where Porter sought assurances from state officials that Griffin would not be allowed to expand its business. Griffin also alleged that Irvin, at Porter's request, called Griffin in 2002. During this conversation, Irvin allegedly told Griffin Vice President Rick Elrod that "East Dublin smells" and that the GDA would "come down on the Dublin Facility hard if it don't straighten out." Compl. ¶ 68 (alterations omitted). Finally, Griffin claimed that Irvin pressured the EPD to "regulate the Dublin Facility's odor emissions despite having no authority to do so and no standards by which to do so." Id. ¶¶ 61.

6.    Lee Myers

Lee Myers, Assistant Commissioner of the Georgia Department of Agriculture, corresponded with Griffin in the fall of 2002 regarding the condition of the wastewater treatment lagoons and efforts to reduce odors from the plant. The letter she sent Griffin on September 16, 2002, said that the GDA "recognizes and appreciates the modifications made by Griffin Industries to help control malodors" but "believe[s] that more needs to be done." Griffin also claimed that it was required to attend a voluntary settlement meeting despite the fact that it "was not

12

aware of, and had not been informed of, any alleged violations of any law or regulation enforced by GDA," id. ¶ 59, and that Myers continued to threaten action against Griffin even though inspectors had not reported malodors at the facility. Griffin alleged that Myers pushed it to adopt odor control measures even though she acknowledged at a hearing on October 29, 2002, that there are no objective standards for odor regulation. Griffin also asserted that Myers participated in the meeting with Irvin, Porter, and other officials on August 5, 2002.

## C.    Procedural History

Griffin filed this section 1983 civil rights suit in the United States District Court for the Northern District of Georgia on March 11, 2005, alleging that each of the state and local defendants violated its constitutional rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The suit contains three substantive counts: an equal protection count, a due process count, and a conspiracy count. All of the charges seek compensatory and punitive damages, along with attorney's fees.

Local defendants Gornto and Kight promptly moved to dismiss the lawsuit. The state officials -- Couch, Reheis, Irvin, Myers, and Porter -- filed a separate motion to dismiss. Both groups argued that most of the conduct alleged fell outside

the two-year statute of limitations for section 1983 claims in Georgia, and that the remaining factual allegations were insufficient to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. All of the defendants also claimed entitlements to qualified immunity.

The district court allowed Griffin's equal protection and conspiracy claims to proceed, finding that the complaint did indeed state a claim and that the defendants were not entitled to qualified immunity. The court did, however, limit the equal protection and conspiracy counts to conduct occurring after March 11, 2003, under Georgia's statute of limitations for § 1983 claims. Griffin's due process count was dismissed on qualified immunity grounds.[5] Defendants timely filed this interlocutory appeal from the district court's denial of qualified immunity. We have jurisdiction over an order denying qualified immunity under the collateral order doctrine. See Mitchell v. Forsyth, 472 U.S. 511, 524–30 (1985).

## II.    DISCUSSION

A motion to dismiss a complaint on qualified immunity grounds will be

---

[5] Griffin had argued that it was denied procedural due process when the EPD suspended its LAS permit. The district court found that Griffin failed to carry its burden of demonstrating that the defendants' conduct violated a clearly established right because reasonable government officials could have believed that the suspension was lawful. Griffin attempted to cross-appeal this decision, but a panel of this court dismissed the cross-appeal for lack of jurisdiction. Griffin Indus. v. Couch, No. 06-12370 (Aug. 8, 2006).

14

granted if the "complaint fails to allege the violation of a clearly established constitutional right." St. George v. Pinellas County, 285 F.3d 1334, 1337 (11th Cir. 2002) (quotation marks and citation omitted). Whether the complaint sets forth a violation is a question of law that we review de novo. Id. We are required to accept the facts as set forth in the plaintiff's complaint as true, and our consideration is limited to those facts contained in the pleadings and attached exhibits. Thaeter v. Palm Beach County Sheriff's Office, 449 F.3d 1342, 1352 (11th Cir. 2006).

Allowing private citizens to bring suit against public officials requires a careful balance between two powerful and competing interests. The importance of vindicating constitutional rights in a court of law must be balanced against the social costs associated with burdening public officials with vexatious litigation and inhibiting them in the proper discharge of their official duties. See Anderson v. Creighton, 483 U.S. 635, 638 (1987). To accommodate these conflicting interests, the Supreme Court has developed the doctrine of qualified immunity.

Qualified immunity shields public officials from civil damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Id. The doctrine does not, however, shield officials who violate an individual's "clearly established" constitutional rights. See, e.g., Hope v. Pelzer, 536 U.S. 730, 743 (2002) (denying qualified immunity because prison

15

guards had "fair warning" that handcuffing an inmate to a hitching post for hours in the Alabama sun violated the Eighth Amendment's proscription of cruel and unusual punishment); Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002) (denying qualified immunity because no reasonable officer could "possibly have believed that he . . . had the lawful authority to take [an arrestee] to the back of her car and slam her head against the trunk after she was arrested, handcuffed, and completely secured").

An official asserting that he is entitled to the protection of qualified immunity must initially establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Id. at 1194. Once the defendant has made this showing, the burden shifts to the plaintiff. Id. Because it is undisputed that the defendants in this case were acting within the scope of their discretionary authority, Griffin bears the burden of overcoming their qualified immunity defense.

A plaintiff attempting to defeat a public official's qualified immunity defense must make two showings. First, the plaintiff must establish that the defendant violated a constitutional right. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007). Then, the plaintiff must show that the violation was clearly established. Id. at 1248–49; see also Hope, 536 U.S. at 741 ("[T]he salient question

16

. . . is whether the state of the law[6] [at the time of the alleged violation] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional."). The two inquiries -- whether there was a constitutional violation and whether the violation was clearly established -- must be conducted in the proper order. Although a court deciding a qualified immunity issue often might find it easier to skip the question of whether there was a constitutional violation and dispose of the case simply on grounds that the law was not clearly established, this approach is prohibited. McClish, 483 F.3d at 1238.

If the official did not violate the law, the inquiry ends. See Scott v. Harris, 127 S. Ct. 1769, 1774 (2007). If, however, the official violated the law but his conduct was not clearly established as unlawful, the court must grant him qualified immunity. McClish, 483 F.3d at 1249. Only when the official violated the law and the illegality of his conduct was clearly established must the court deny him the protection of qualified immunity. See Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (denying qualified immunity when the officer's conduct was "so far beyond the hazy border between excessive and acceptable force" that its illegality was clearly established despite the lack of factually analogous case law).

---

[6] We have held that constitutional provisions, federal statutes, and judicial decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the relevant state are all capable of clearly establishing the law. See Marsh v. Butler County, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc).

17

Finally, we observe that qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). This is the logic behind allowing interlocutory appeals from the denial of qualified immunity, id. at 526–27, and it is the basis for the Court's repeated emphasis on resolving qualified immunity issues at the "earliest possible stage in litigation," Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam). See also Scott, 127 S. Ct. at 1773 n.2 (discussing the interlocutory appeal and early disposition rules).

## A.    Did Defendants Violate Griffin's Equal Protection Rights?

This is not the normal equal protection case. Griffin Industries does not claim that it was discriminated against because it belongs to a protected class such as race or gender. Instead, Griffin bases its equal protection claim on a less-developed strand of equal protection jurisprudence: the "class of one" claim, first expressly recognized by the Supreme Court in Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam).

The district court found that, based on the facts as alleged, the defendants violated Griffin's rights under the Equal Protection Clause. The court began by

18

discussing Olech's recognition of "class of one" claims and went on to discuss Griffin's allegations against the defendants. Specifically, the court observed, Griffin claimed that the defendants violated the Constitution by subjecting it to undue and improper regulatory requirements, imposing arbitrary and capricious requirements, and intentionally acting to deprive it of assets, money, contracts, business, and the right to conduct business. Dist. Ct. Order at 21. The court also highlighted Griffin's claims that it was "singled out" by the defendants and that a "similarly situated" entity, American Proteins, had not been subjected to similar treatment. These allegations, the court concluded, were sufficient to state an equal protection claim.

Our de novo review of the district court's conclusion begins with Olech, the only Supreme Court case to explicitly discuss a "class of one" claim. In that case, Olech had asked the Village of Willowbrook to connect her property to the municipal water supply. The Village told her that it would provide her a connection if, but only if, she granted the Village a 33-foot easement on her property. Olech protested, noting that the Village had only required her neighbors to provide 15-foot easements in exchange for their connections. 528 U.S. at 563. Although the Village eventually relented and connected Olech in return for a 15-foot easement, Olech sued. She alleged that the 33-foot easement demand was "irrational and

wholly arbitrary" and violated her right to equal protection by deviating from the standard 15-foot easement. Id. The district court dismissed her claim, but the Seventh Circuit reversed, finding that Olech's complaint stated an equal protection claim. Id. at 563–64; see Olech v. Vill. of Willowbrook, 160 F.3d 386, 387–88 (7th Cir. 1998), aff'd, 528 U.S. 562.

The Supreme Court granted the Village's petition for certiorari to determine "whether the Equal Protection Clause gives rise to a cause of action on behalf of a 'class of one' where the plaintiff did not allege membership in a class or group." Olech, 528 U.S. at 564. The Court's answer, provided in a four-page per curiam opinion, was that "class of one" equal protection claims are indeed cognizable under the Fourteenth Amendment. The Court's reasoning was set forth in this way:

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. See Sioux City Bridge Co. v. Dakota County, 260 U.S. 441 (1923); Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U.S. 336 (1989). In so doing, we have explained that "'[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" Sioux City Bridge Co., supra, at 445 (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352 (1918)).
>
> That reasoning is applicable to this case. Olech's complaint can fairly be construed as alleging that the Village intentionally demanded

20

a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners. See Conley v. Gibson, 355 U.S. 41, 45–46 (1957). The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after receiving a clearly adequate 15-foot easement. These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis. We therefore affirm the judgment of the Court of Appeals, but do not reach the alternative theory of "subjective ill will" relied on by that court.

Id. at 564–65.

Although the Court observed that it had previously recognized claims like Olech's, the case was nonetheless an important development in equal protection jurisprudence. The "class of one" phrasing had never been used by the Court in the equal protection context,[7] and the cases cited by the Court did not expressly state that equal protection claims were cognizable apart from class-based discrimination.[8] Moreover, both cases cited as "previously recognizing" class of one claims are about "as far removed from the pantheon of influential equal

---

[7] If the phrase seems familiar, it may be because it has been used in the Court's jurisprudence regarding the Bill of Attainder Clause. See Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 472 (1977) (holding that the Presidential Recordings and Materials Preservation Act was not an unconstitutional bill of attainder because former President Nixon "constituted a legitimate class of one").

[8] In fact, the Court had previously implied that equal protection claims required class-based discrimination. See Oyler v. Boles, 368 U.S. 448, 456 (1962) ("[I]t was not stated that the [alleged discriminatory conduct] was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged.").

protection cases as one could imagine." Robert C. Farrell, Classes, Persons, Equal Protection, and *Village of Willowbrook v. Olech*, 78 Wash. L. Rev. 367, 394 (2003). Nevertheless, they do recognize equal protection claims in the absence of class-based discrimination.

In Sioux City Bridge Co. v. Dakota County, 260 U.S. 441 (1923), the Court recognized a plaintiff's equal protection claim where the state tax assessor "intentionally and arbitrarily assessed the Bridge Company's property at 100 per cent. of its true value and all the other real estate and its improvements in the county at 55 per cent." Id. at 445. Similarly, in Allegheny Pittsburgh Coal Co. v. County Commission of Webster County, 488 U.S. 336 (1989), the Court recognized an equal protection claim where the plaintiff's property had "been assessed at roughly 8 to 35 times more than comparable neighboring property, and these discrepancies have continued for more than 10 years with little change." Id. at 344. In both cases, the plaintiffs had not alleged that they were members of any particular class, yet the Court recognized their claims under the Equal Protection Clause.

We begin our analysis of Griffin's claim with the observation that a "class of one" claim involves a plaintiff who "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the

22

difference in treatment." Olech, 528 U.S. at 564. In a case involving a qualified immunity defense, a plaintiff who fails to allege both elements of a "class of one" equal protection claim has not met its burden of showing that the defendant's conduct violated a right embodied in the Constitution. We come, then, to two dispositive issues: (1) whether Griffin alleged that the defendants intentionally treated it differently from others who were similarly situated, and (2) if so, whether it claimed that there was no rational basis for the disparate treatment.

1.    Did the Defendants Intentionally Treat Griffin Differently from Others Who Were Similarly Situated?

Griffin claims that the defendants singled it out for punitive action, and that other similarly situated chicken rendering plants were not subjected to similar regulation. Griffin's complaint focused solely on American Proteins, its competitor in the Georgia poultry rendering business, specifically alleging that "Griffin Industries and American Proteins are similarly situated poultry rendering facilities," and that defendants have "disparately treated and disparately regulated Griffin Industries in a way that its competitors, including American Proteins, are not treated or regulated."

The central issue here is what degree of similarity is required for two entities to be considered "similarly situated." Too broad a definition of "similarly situated"

23

could subject nearly all state regulatory decisions to constitutional review in federal court and deny state regulators the critical discretion they need to effectively perform their duties. Conversely, too narrow a definition of "similarly situated" could exclude from the zone of equal protection those who are plainly treated disparately and without a rational basis.

Olech's situation was very similar, if not identical, to that of her neighbors -- she was a property owner requesting a connection to the municipal water supply, and the Village required her to provide an easement in return. Olech, 528 U.S. at 563. The similarity between Olech and her neighbors was obvious because the Village, as the governmental decisionmaker, had a policy that did not involve a large number of factors in its application. The tax assessment cases cited by the Supreme Court in Olech exhibit the same basic pattern -- the plaintiffs claimed that the government assessed taxes on the plaintiffs' property at one rate while assessing all other property in the jurisdiction at a much lower rate. See Allegheny Pittsburgh Coal, 488 U.S. at 344; Sioux City Bridge, 260 U.S. at 445.

This is not to say that the governmental decisions challenged in those cases were simple. For example, Sioux City Bridge involved a factual dispute over the current value of the bridge, which was thirty-five years old and, "while in good repair[, was] too light for modern traffic." 260 U.S. at 442–43. The bridge also

crossed the Missouri River, which delineates the boundary between Nebraska and Iowa, so the percentage of the bridge's value allocable to each state was part of the underlying dispute. Id. at 442. Similarly, the market value dispute in Allegheny Pittsburgh Coal involved the "topography, location, access, development, mineral content and forestation" of the  allegedly overtaxed parcel. 488 U.S. at 340–41 n.3 (internal quotations and citation omitted).

In each case, however, the Court was able to analyze the "similarly situated" requirement succinctly and at a high order of abstraction. This was because the challenged governmental decisions were ultimately one-dimensional -- they involved a single answer to a single question. In Olech, the only relevant factor was the size of the easement required in return for connection to the municipal water supply. In Allegheny Pittsburgh Coal and Sioux City Bridge, the only relevant factor was the market value of the property.

Here, by contrast, the government's regulatory action was undeniably multi-dimensional, involving varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time. In reviewing these decisions, we cannot use a simplistic, post-hoc caricature of the decisionmaking process. Governmental decisionmaking challenged under a "class of one" equal protection theory must be evaluated in light of the full variety of factors that an

25

objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision. Accordingly, when dissimilar governmental treatment is not the product of a one-dimensional decision -- such as a standard easement or a tax assessed at a pre-set percentage of market value -- the "similarly situated" requirement will be more difficult to establish.

This approach finds support in our case law. In Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006), the only published Eleventh Circuit decision involving the "similarly situated" requirement in the "class of one" context, we addressed a claim brought by a developer denied approval for a proposed building project. Id. at 1309. We began by observing that a "showing that two projects were similarly situated requires some specificity," and went on to conclude that the projects being compared "must be prima facie identical in all relevant respects." Id. at 1314 (emphasis added). After reviewing the plaintiff's purported comparators, we rejected them all. A similarly situated project that was "prima facie identical in all relevant respects" would be a plan to develop residential apartments, not a commercial or mixed-use plan. Id. Moreover, it would be essentially the same size, have an equivalent impact on the community, and require the same zoning variances. Id. at 1316 & n.8. Finally, a similarly situated project would need to be subject to the same governmental decisionmaking process -- not just a similar

development project, but a development where the developer actually sought the same form of tentative approval from the city. Id. at 1315.

In Campbell, the factors relevant to an objectively reasonable governmental decisionmaker included the size of the development, the action requested from the city, the project's zoning status, and so on. Not surprisingly, we rejected the plaintiff's claim when it failed to show the existence of a comparator who was similarly situated in these basic respects. It was not enough that the city had granted approval for a 16-unit apartment complex when the plaintiff sought approval of a complex containing 144 to 180 units, because "[i]t is rational that a zoning board would be less likely to grant a variance to a development that would violate a zoning ordinance like the density requirement to a greater degree." Id. at 1316 n.8.

We have applied a similar standard to private employment discrimination claims brought under the Equal Protection Clause outside the "class of one" context. Similar employees may perform similar functions in different ways. Such differences often will be relevant to an employer's decisions, and they may lawfully result in different employment outcomes. Thus, for example, two nurses performing superficially similar roles at a hospital might differ in their job performance or tardiness. The hospital would clearly find such distinctions relevant

27

in making employment decisions, and it would not violate the Equal Protection Clause if it did, in fact, make different decisions with respect to each employee on this basis. Accordingly, we have held that an African-American nurse alleging that her hospital employer treated her differently from a similarly situated Caucasian nurse could not simply rely on broad generalities in identifying a comparator. Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316–19 (11th Cir. 2003). Although both nurses had similar histories of problems with coworkers, the court found it significant that the plaintiff's proposed comparator had a better record when it came to job performance and tardiness. Id. at 1316–17. In evaluating this claim, we held that employees must be "similarly situated in all relevant respects." Id. at 1316 (emphasis added, quotation marks and citation omitted).

We see no reason that a plaintiff in a "class of one" case should be subjected to a more lenient "similarly situated" requirement than we have imposed in other contexts. Adjudging equality necessarily requires comparison, and "class of one" plaintiffs may (just like other plaintiffs) fairly be required to show that their professed comparison is sufficiently apt. See Campbell, 434 F.3d at 1314; Purze v. Vill. of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir. 2002) (observing that plaintiffs in a "class of one" case "must demonstrate that they were treated differently than someone who is prima facie identical in all relevant respects"

28

(emphasis added)); <u>Hicks v. Jackson County Comm'n</u>, 374 F. Supp. 2d 1084, 1096 (N.D. Ala. 2005) ("The burden of identifying similarly situated individuals is a heavy one."); <u>cf.</u> <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in <u>all relevant respects</u> alike." (emphasis added). Accordingly, when plaintiffs in "class of one" cases challenge the outcome of complex, multi-factored government decisionmaking processes, similarly situated entities "must be very similar indeed." <u>McDonald v. Vill. of Winnetka</u>, 371 F.3d 992, 1002 (7th Cir. 2004).

A "class of one" plaintiff might fail to state a claim by omitting key factual details in alleging that it is "similarly situated" to another. <u>See</u> <u>GJR Invs., Inc. v. County of Escambia</u>, 132 F.3d 1359, 1367–68 (11th Cir. 1998) ("With regard to the 'similarly situated' prong, the complaint does not present a single instance in which a similarly situated developer was granted a permit; it merely alleges that nameless, faceless 'other' permit applicants were given better treatment. Bare allegations that 'other' applicants, even 'all other' applicants, were treated differently do not state an equal protection claim . . . .").

Ironically, the lack of detail is not the problem here. Griffin's problem is not that it has said too little, but that it has said too much. <u>See</u> <u>Gen. Guar. Ins. Co. v.</u>

29

Parkerson, 369 F.2d 821, 825 (5th Cir. 1966)[9] ("This complaint is plagued not by what it lacks, but by what it contains. All of the paths to relief which the pleading suggests are blocked by the allegations and the attached documents themselves, without more."); Simmons v. Peavy-Welsh Lumber Co., 113 F.2d 812, 813 (5th Cir. 1940) ("This is not a case where the plaintiff has pleaded too little, but where he has pleaded too much and has refuted his own allegations by setting forth the evidence relied on to sustain them. The appellant was not content to make a short and plain statement of the facts, but undertook to plead evidentiary facts in detail. . . . The litigant may be defeated by his own evidence, the pleader by his own exhibits; the appellant has become enmeshed in his own prolixity.").

Griffin's complaint contains an abundance of factual detail; the complaint itself is 41 pages long, and it was accompanied by 21 different exhibits. Under the Federal Rules of Civil Procedure, these exhibits are part of the pleading "for all purposes." Fed. R. Civ. P. 10(c); see Solis-Ramirez v. U.S. Dep't of Justice, 758 F.2d 1426, 1430 (11th Cir. 1985) (per curiam) ("Under Rule 10(c) Federal Rules of Civil Procedure, such attachments are considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion.").

Although Griffin's complaint makes the conclusory allegation that it is

---

[9] Fifth Circuit cases decided prior to October 1, 1981 are binding precedent in this circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

similarly situated to American Proteins in all relevant ways, the exhibits attached to the complaint plainly show that this is not the case. Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations. Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern. See Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974) ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document, to be treated as part of the complaint for all purposes under Rule 10(c), Fed.R.Civ.P., reveals facts which foreclose recovery as a matter of law, dismissal is appropriate." (citation omitted)); Simmons, 113 F.2d at 813 ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.").

According to its complaint, Griffin had recently increased the volume of its rendering activity, and this increase in volume coincided with an increase in citizen complaints. See Compl. ¶ 25 ("In the late 1990s, the Dublin Facility began to receive an increased number of complaints from surrounding residents regarding alleged odor."); id. ¶ 27 ("It was also at this time that Griffin Industries entered into

31

contracts with significant poultry producers in the State of Georgia."). However, the complaint contains no reference to citizen complaints or volume increases at the named comparator, American Proteins. Similarly, the complaint is filled with allegations regarding the intense political pressure generated by East Dublin citizens unhappy with the operation of the Griffin plant, but there is no allegation that American Proteins was the subject of pressure from unhappy citizens. In evaluating whether a regulator has treated two facilities differently, all three points -- recent substantial changes in the volume of industrial activity, high levels of citizen complaints, and pressure from local politicians -- are relevant in the comparison.

But perhaps the clearest illustration that Griffin and American Proteins were not, by the terms of Griffin's own complaint, similarly situated is found in the state administrative law judge decision attached to the complaint. When Griffin appealed the EPD's emergency permit suspension, the administrative law judge overturned the EPD order because the situation at the Griffin plant was not an emergency posing a "substantial and imminent threat to the quality of the waters of the State of Georgia or the public health." Comp. Ex. R at 9. In reaching this conclusion, the administrative law judge observed that American Proteins, like Griffin, had received high pollutant readings from a monitoring well.

32

Notable, however, was the additional fact that, unlike Griffin Industries, "American Proteins itself alerted EPD of possible water pollution problems at its plant and has been very cooperative in seeking to remediate such problem[s]." Id. at 6–7. As the judge explained, "[a]ccurate self-monitoring and reporting by permittees is an essential component of environmental regulation in Georgia. EPD depends on accurate information from permittees in order to carry out its regulatory responsibilities." Id. at 3. There is no indication in the complaint that Griffin self-reported any problems with its LAS to anyone. On the contrary, the administrative law judge specifically noted that "EPD did establish that numerous events occurring around the first part of 2003 made it suspect for the first time that there might be problems with the operation of East Dublin's LAS and with the reliability of the data which it had received in the past from the East Dublin Plant." Id. at 9.

Accurate self-reporting is critical to the effective enforcement of environmental laws. When regulated entities independently discover and disclose environmental violations, for example, the EPA eliminates or substantially reduces civil and criminal penalties. See EPA Environmental Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations -- Final Policy Statement, 65 Fed. Reg. 19,618 (Apr. 11, 2000). The purpose of this policy, known

33

as the "Audit Policy," is "to enhance protection of human health and the environment by encouraging regulated entities to voluntarily discover, disclose, correct and prevent violations of Federal environmental law." Id. As the EPA observed, "because government resources are limited, universal compliance cannot be achieved without active efforts by the regulated community to police themselves." Id. at 19,619.

The state regulators at the EPD and GDA have limited enforcement resources, and they plainly rely on the voluntary cooperation of the companies they regulate. Accordingly, it should not come as a surprise that these regulators would treat companies that self-report differently. In fact, a regulator who failed to account for differences in self-policing among regulated entities would remove any incentive for voluntary cooperation. Griffin's own complaint tells us that self-reporting is important, that American Proteins self-reported, and that Griffin did not. This difference is nothing if not relevant, and it is fatal, we think, to Griffin's claim that the defendants acted unconstitutionally in not treating them alike.

"The reason that there is a 'similarly situated' requirement in the first place is that at their heart, equal protection claims, even 'class of one' claims, are basically claims of discrimination." McDonald, 371 F.3d at 1009. To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory

34

dispute, we are obliged to apply the "similarly situated" requirement with rigor. "Different treatment of dissimilarly situated persons does not violate the equal protection clause." E & T Realty v. Strickland, 830 F.2d 1107, 1109 (11th Cir. 1987). Because Griffin's own complaint shows that it was not similarly situated to American Proteins in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker, Griffin fails to state a claim for a "class of one" equal protection violation.

2.      Was There a Rational Basis for the Difference in Treatment?

But even if Griffin had successfully alleged the "similarly situated" requirement, its claim would still fail. Griffin's complaint does not, on its face, meet the second prong of its "class of one" claim -- the requirement that there be no rational basis for the difference in treatment. As with the similarly situated requirement, we think that Griffin's pleading is fatal to its claim. The complaint is filled with facts that suggest a rational basis for the defendant's actions. We need not ignore these facts in favor of Griffin's bald assertion that the defendants acted without any rational basis.

Regulators act on the basis of available information. Here, the information available to the state officials included troublesome testing data, a report from a

35

local official alleging severe environmental violations, large numbers of odor complaints from local residents, ongoing concerns about the effectiveness of Griffin's water treatment regimen, and a concurrent criminal investigation by the EPA. Again, Griffin's own complaint provides the information leading to the conclusion that the state officials acted rationally. Thus, for example, the administrative law judge explicitly stated that one of Griffin's monitoring wells showed "alarmingly high" levels of nitrates in samples taken in February and March 2003. We fail to see how it is "irrational" for regulators to suspend a permit when testing data indicates "alarmingly high" levels of pollution.

As for the local officials, the pleading also shows a high number of citizen complaints about the pungent odor coming from Griffin's chicken rendering plant. Local officials undoubtedly act "rationally" when they take up such legitimate concerns with state decisionmakers -- here, the environmental regulators. Indeed, this is precisely what their constituents elect them to do. When a high volume of citizen complaints about discernable odors emanating from a nearby manufacturing facility is combined with "alarmingly high" pollution readings and the possibility that the company has been incorrectly maintaining required records, there can be precious little doubt that a local public official acts rationally in taking his concerns to state regulators charged with enforcing the environmental laws of the state. In

sum, the suggestion that the defendants violated the Equal Protection Clause by responding to the concerns of local citizens is, under these circumstances, without merit.

Equal protection of the laws in the "class of one" context requires no more than that Griffin be "secure[d] . . . against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Olech, 528 U.S. at 564 (quotation marks and citation omitted). Griffin has failed to demonstrate any such "discrimination" because its own complaint shows that it was not similarly situated to its purported comparator. And even if Griffin had been able to show that it was similarly situated, the facts contained in Griffin's complaint demonstrate that the government actors had a wholly rational foundation for their conduct. There was nothing "arbitrary" in the defendants' actions.

**B.     Was the Violation Clearly Established?**

Because Griffin has failed to adequately allege a constitutional violation, the defendants are entitled to have the complaint dismissed. Nonetheless, we proceed to discuss the second prong of the qualified immunity analysis out of concern that district courts be properly equipped to evaluate qualified immunity defenses in the

context of an increasing volume of "class of one" equal protection claims. See, e.g.,

Macon County Invs., Inc. v. Warren, No. 3:06-CV-224-WKW, 2007 U.S. Dist.

LEXIS 3806 (M.D. Ala. Jan. 17, 2007) (discussing a claim arising from

amendments to bingo rules); Vickers v. Egbert, 359 F. Supp. 2d 1358 (S.D. Ala.

2005) (limits on stone crab fishing in Florida); Hicks v. Jackson County Comm'n,

374 F. Supp. 2d 1084 (N.D. Ala. 2005) (public employment); Berkos v. Vill. of

Wellington, No.02-81102-CIV, 2003 U.S. Dist. LEXIS 25644 (S.D. Fla. Mar. 20,

2003) (limits on the size of a barn under local building permit rules).

The district court in this case found that the violation was clearly established

under Olech and an Eleventh Circuit case, Executive 100, Inc. v. Martin County,

922 F.2d 1536 (11th Cir. 1991). The district court's reasoning, in its entirety, was

that Olech and Executive 100 "concern violations of equal protection rights, and the

Court concludes that these cases were sufficient to put a reasonable state official on

notice that the conduct alleged here was unlawful."

In Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002), we considered three

ways in which the law could be clearly established. First, conduct may be clearly

established as illegal through explicit statutory or constitutional statements. Id. at

1350. Second, certain "authoritative judicial decision[s]" may establish broad

principles of law that are clearly applicable in a variety of factual contexts going

38

beyond the particular circumstances of the decision that establishes the principle. <u>Id.</u> at 1351. Third, and most common, is the situation where case law previously elucidated in materially similar factual circumstances clearly establishes that the conduct is unlawful. <u>Id.</u> at 1351–52. None are applicable.

The first category is inapplicable because the Equal Protection Clause would not have provided the defendants with fair warning under these circumstances. Under well-established qualified immunity doctrine, the Fourteenth Amendment's broad command that no state shall "deny to any person within its jurisdiction the equal protection of the laws" may, as it does here, simply operate at too high a level of generality. <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987):

> The operation of this [clearly established] standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of [the qualified immunity doctrine]. Plaintiffs would be able to convert the rule of qualified immunity . . . . from a guarantee of immunity into a rule of pleading.

The second category, "authoritative judicial decisions," is also inapplicable. In <u>Vinyard</u>, we described this second category as involving "precedents [that] are

hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents." 311 F.3d at 1351. <u>Olech</u> and <u>Executive 100</u> are not such cases. The legal principle established in <u>Olech</u> and, less explicitly, in <u>Executive 100</u> -- that the Fourteenth Amendment forbids the denial of equal protection even when the plaintiff is only a "class of one" -- is certainly broad. This principle does not, however, fit <u>Vinyard</u>'s definition of a precedent that is "hard to distinguish from later cases because so few facts are material to the broad legal principle." 311 F.3d at 1351. To the contrary, as our substantive analysis shows, the precise facts of a case are critical in evaluating a "class of one" claim.

This leaves only the third category, cases where binding precedent "has said that 'Y Conduct' is unconstitutional in 'Z Circumstances.'" <u>Id.</u> This is the most common scenario, because "most judicial precedents are tied to particularized facts and fall into this category." <u>Id.</u> at 1351–52. In the third category, the inquiry is whether the facts of a previous case are "fairly distinguishable" from the case before the court:

> When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies. On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the

precedent can clearly establish the applicable law.

Id. at 1352.

Olech and Executive 100 are "fairly distinguishable" from the present case. In Olech, the challenged governmental decision involved zoning. As we have already observed, the nature of the decision allowed the Court to conduct the "similarly situated" analysis at a high level of abstraction. The same is true of Executive 100, another zoning case. Executive 100 involved a governmental decision we would characterize as one-dimensional -- plaintiffs were denied a zoning variance, while other individuals had been granted the same variance. Executive 100, 922 F.2d at 1538. Here, in sharp contrast, the defendants were engaged in a complex, multi-year process of environmental regulation. This difference, standing alone, makes this case "fairly distinguishable" from Olech and Executive 100.

In sum, even if Griffin had stated a violation of the Equal Protection Clause, the district court erred in holding that the defendants' alleged conduct constituted a violation of clearly established law. Neither the state officials nor the local officials had "fair warning" that their actions might subject them to legal liability. Consequently, to hold them liable "would destroy the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public

officials' effective performance of their duties, by making it impossible for officials reasonably to anticipate when their conduct may give rise to liability for damages." Anderson, 483 U.S. at 639 (quotation marks and alteration omitted).

## III. CONCLUSION

After thorough review, we reverse the district court's denial of qualified immunity for the defendants. Griffin's "class of one" claim fails to properly allege that the individual defendants intentionally treated a "similarly situated" entity in a disparate manner. Moreover, the facts in Griffin's own complaint plainly contradict the conclusory allegation that the defendants had no rational basis for taking regulatory action. In short, Griffin has failed to allege that the defendants violated the Equal Protection Clause of the Fourteenth Amendment, and it has failed to meet its burden of showing that the defendants were not entitled to qualified immunity.[10]

REVERSED and REMANDED.

---

[10] Griffin moved for sanctions pursuant to Eleventh Circuit Rule 33-1(f) against Gornto, Myers, Irvin, and Porter for failure to appear at a circuit mediation conference on June 1, 2006. This motion for sanctions was carried with the case, and it is hereby DENIED.